**THE CANADIAN ST. REGIS BAND OF MOHAWK INDIANS by Lawrence Francis, Chief, and Lloyd Benedict, Mike Mitchell, Bruce Roundpoint, Joe Jacobs, John Oakes, Angus Bonaparte, Jr., David Benedict, Joyce Sharow, Robert Sunday, William Sunday and John Lazore, Council Members, Plaintiffs,**

**and**

**St. Regis Mohawk Tribe, by the St. Regis Mohawk Tribal Council, the People of the Longhouse at Akwaesasne by the Mohawk Nation, Consolidated Plaintiffs,**

**The United States of America, Plaintiff–Intervenor.**

**v.**

**The State of NEW YORK, George E. Pataki, as Governor of the State of New York, the County of St. Lawrence, New York, the County of Franklin, New York, the Village of Massena, New York, the Town of Massena, New York, the Town of Bombay, New York, the Town and Village of Fort Covington, New York, Farmers National Bank, n/k/a Key**

Bank of Northern New York, N.A., Nationwide Mutual Insurance Co., Niagara Mohawk Power Corporation, Marine Midland Properties Corp., Walsh Realty Corp., and Canadian National Rail Ways, Defendants,

The St. Regis Mohawk Tribe, by the St. Regis Mohawk Tribal Council and the People of the Longhouse at Akwesasne, by The Mohawk Nation Council of Chiefs, Plaintiffs,

The United States of America, Plaintiff–Intervenor,

v.

v.

The State of New York, George E. Pataki, as Governor; County of St. Lawrence; County of Franklin; Village of Massena; Town of Massena; Town of Bombay; Town and Village of Fort Covington; Key Bank of Northern New York, N.A.; Nationwide Mutual Insurance Co.; Niagara Mohawk Power Co.; Canadian National Railways; Power Authority of the State of New York; William J. Brockway; Loretta Brockway; James Chapman; Mary Chapman; Robert Chapman; Burton Chapman; Paul Compeau; Catherine Compeau; Real C. Coupal; Thelma B. Coupal; Harry Grow; Laurent Hebert; Vincent Jerry; Daniel Jerry; Ernest L. Jock; Carrie Jock; Alpha Latray; Duane Stewart; Kay Stewart; Thomas Torrey; and Eloise Torrey, Defendants.

The Canadian St. Regis Band of Mohawk Indians by Lawrence Francis, Chief, and Lloyd Benedict, Mike Mitchell, Bruce Roundpoint, Joe Jacobs, John Oakes, Angus Bonaparte, Jr., David Benedict, Joyce Sharow, Robert Sunday, William Sunday and John Lazore, Council Members, Plaintiffs,

The United States of America, Plaintiff–Intervenor,

v.

The State of New York, George E. Pataki as Governor of the State of New York, St. Lawrence Seaway Development Corp., David W. Oberlin, Administrator, St. Lawrence Seaway Development Corp., Niagara Mohawk Power Co., and Power Authority of the State of New York, Defendants.

Nos. 5:82–CV–783, 5:82-CV-1114.

United States District Court, N.D. New York.

July 28, 2003.

Indian Law Resource Center, Washington, DC (Steven Tullberg, Alexandra Page, of counsel), for People of Longhouse at Akwesasne by Mohawk Nation Counsel of Chiefs.

Frances M. Zizila, Trial Attorney, U.S. Department of Justice Environment & Natural Resources Division–Indian Resources, Washington, DC, for U.S.

Hobbs Straus Dean & Walker, Washington, D.C. (Hans Walker, Jr., Charles Hobbs, of counsel), Sonosky Chambers Sachse Endreson & Perry (Harry R. Sachse, James T. Meggesto, of counsel), for Canadian St. Regis Band of Mohawk Indians & St. Regis Mohawk Tribal Council.

David E. Blabey, Albany, NY (Arthur T. Cambouris, of counsel), for Power Authority of State of New York.

Hiscock & Barclay, Syraqcuse, NY (Judith M. Sayles, Alan R. Peterson, of counsel), for County of St. Lawrence, County of Franklin, Village of Massena, Town of Bombay, Town and Village of Fort Covington, Key Bank of Northern New York, N.A.; Nationwide Mutual Insurance Co.; Niagara Mohawk Power Co.; and Canadian National Railways.

Eliot Spitzer, Attorney General, Albany, NY (David B. Roberts, Christopher W.

Hall, Asst. Attorneys General, of Counsel),
for State of New York.

## OUTLINE

| | | Page |
|---|---|---|
| *Introduction* | | 321 |
| *Background* | | 322 |
| **I.** | *St. Regis IV* | 322 |
| **II.** | *Thompson II* | 322 |
| **III.** | *Overview of Arguments* | 323 |
| *Discussion* | | 324 |
| *Motion to Strike Affirmative Defenses* | | 324 |
| **I.** | *Rule 12(f) Standard* | 324 |
| **II.** | *Affirmative Defenses* | 325 |
| | **A.** *Standing* | 325 |
| | **B.** *"Defenses Already Considered By the Court"*[1] | 329 |
| | *1. Laches* | 330 |
| | *2. Eleventh Amendment* | 333 |
| | **C.** *"Defenses Clearly Rejected By the Supreme Court"* | 335 |
| | *1. Abatement* | 335 |
| | *2. Statute of Limitations* | 336 |
| | *a. "Good Faith" Modification* | 336 |
| | *b. 42 U.S.C. § 1983* | 337 |
| | **D.** *"Delay Based Defenses"* | 338 |
| | *1. Estoppel* | 338 |
| | *2. Mitigation* | 340 |
| | **E.** *Non–Delay Based Defenses* | 341 |
| | *1. Accord & Satisfaction* | 342 |
| | *2. Unclean Hands* | 342 |
| | *3. Waiver* | 342 |
| | **F.** *"Non–Federal Ratification" Defenses* | 343 |
| | *1. Abandonment* | 343 |
| | *2. Release & Relinquishment* | 346 |
| | *a. "Defense Based on Treaty of Buffalo Creek"* | 348 |
| | *3. "State Title"* | 348 |
| | **G.** *Exhaustion of Remedies* | 349 |
| | **H.** *Indispensable Party* | 350 |
| | **I.** *"Defense of Setoff or Offset"* | 352 |
| | **J.** *Disestablishment & Diminishment* | 355 |
| | **K.** *Defenses Properly Pled* | 355 |
| **III.** | *Conclusion as to Affirmative Defenses* | 356 |
| **IV.** | *Counterclaims* | 356 |
| | **A.** *Legal Standards* | 357 |

1. Any heading appearing in quotation marks indicates that it is the Tribal plaintiffs' characterization. No meaning should be attributed to these denotations; they are for ease of reference only.

B. *Immunity* ..................................................................358
 1. *"Recoupment"* ...................................................359
 2. *Disestablishment* ............................................360
 3. *"Contribution"* ................................................360
 4. *"Quiet Title Act"* .............................................363
 5. *Administrative Procedure Act* ......................363
 6. *Judiciary and Judicial Procedure Act* ...........363

V. *Rulings* ......................................................................363

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

"This is *deja vu* all over again." Those immortal words, attributed to the former New York Yankee great and Hall of Fame catcher Lawrence Peter "Yogi" Berra,[2] come readily to mind here. The arguments which the parties are raising have a strangely familiar ring to them. Indeed, *all* of the affirmative defenses *and all* of the counterclaims being challenged on these motions have already been considered either over two years ago in this action, *see Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F.Supp.2d 170 (N.D.N.Y.2001) ("*St. Regis IV*"), or in other land claim litigation before this and other federal district and appellate courts.

## INTRODUCTION

Currently pending before the court are two separate but related sets of motions. Broadly stated, in the first set of motions the plaintiffs[3] are seeking to strike numerous affirmative defenses, while in the second the Tribes and the United States as plaintiff-intervenor,[4] are seeking to dismiss certain counterclaims.[5]

---

2. This epigram is often attributed to Yogi Berra, "a man as famous for mangling the English language as for belting baseballs." *Williams v. Ashland Engineering Co., Inc.*, 45 F.3d 588, 589 n. 1 (1st Cir.1995), *rev'd on other grounds, Carpenters Local Union No. 26 v. United States Fidelity & Guaranty Co.*, 215 F.3d 136 (1st Cir.2000). He "'denies ever saying it[,]'" however. *Id.* (quoting Ralph Keyes, *Nice Guys Finish Seventh; Phrases, Spurious Sayings and Familiar Misquotations* 152 (1992)).

3. There are three separate plaintiffs herein. In addition to the St. Regis Mohawk Tribe ("the St. Regis Tribe"), there are two other tribal entities: the Mohawk Council of Akwesasne (formerly known as the Canadian St. Regis Band of Mohawk Indians) ("the Canadian Band"), and The People of the Longhouse (Mohawk Nation Council of Chiefs) ("People of the Longhouse"). Except where necessary to distinguish among them, collectively they will be referred to throughout as "the Tribes." As will be seen, because there is a standing issue, the court stresses, as it has previously, that its reference to plaintiffs in "tribal" terms "is a matter of convenience and [is] *not* meant to imply or confer any legal significance upon those groups." *See St. Regis IV*, 146 F.Supp.2d at 174 n. 3 (emphasis added).

4. When necessary, the Tribes and the U.S. will be jointly referred to simply as "the plaintiffs."

5. Among others, the State of New York and the governor are both named as defendants herein. They will be jointly referred to throughout as "the State." In addition to the State, there are a number of other defendants in this action. The "Municipal defendants" are a group comprised of St. Lawrence and Franklin Counties the Village and Town of Massena; the Town of Bombay; the Town and Village of Fort Covington; Key Bank of Northern New York, N.A.; Nationwide Mutual Insurance Company; Niagara Mohawk Power Company; Canadian National Railways; and the defendant class, all of which are being represented by the same counsel. Another defendant is the Power Authority of the State of New York (the "Power Authority").

## BACKGROUND

### I. St. Regis IV

Much of the extensive background of this case was recounted in *St. Regis IV*, 146 F.Supp.2d at 174–77. The interplay between *St. Regis IV* and the current motions warrants a brief overview of that case though, as well as what has transpired in the interim.

From the outset the history of this lawsuit can best be described as a series of fits and starts, as to both settlement efforts and motion practice. Despite initial motion filings in late 1989, because of sporadic and ultimately futile negotiation efforts, along with the evolving state of Indian land claim law, not until May 30, 2001 did the court issue its first substantive decision in this case.

At that time the court made several rulings which are germane here. First, it denied the State's and the Power Authority's motion to dismiss based on Eleventh Amendment immunity. *See id.* at 180–81. Next, the court rejected the defendants' argument that the Canadian Band and the People of the Longhouse lacked standing, because supposedly they do not have the requisite tribal status to bring claims under the Nonintercourse Act, 25 U.S.C. § 177 (West 2001) ("NIA"). *See id.* at 181–85. Third, the court rejected defendants' argument that the equitable doctrine of laches bars the Tribes' and the U.S.' claims. *See id.* at 186.

Since *St. Regis IV*, there has been no significant change in the status of this action. No discovery has yet been conducted. Nonetheless, almost exactly two years after *St. Regis IV*, a second round of substantive motions is now before the court. Although all motion papers were filed by October 31, 2002, with oral argument scheduled for December 19, 2002, just ten days prior to that the Second

Circuit issued *Thompson v. County of Franklin*, 314 F.3d 79 (2d Cir.2002) ("*Thompson II*"). *Thompson II* prompted several parties to request an opportunity to provide supplemental briefing as to the impact, if any, of that decision upon the pending motions. Granting that request, the court allowed the parties to file such briefs no later than February 14, 2003; that has now been done. Given the voluminous and thorough briefing, the court did not deem oral argument necessary, however.

### II. Thompson II

In *Thompson II* the Court found that plaintiff's land, which she claimed was part of the St. Regis Mohawk Indian Reservation, but upon which there were no restrictions on alienation, was subject to the defendant County's *ad valorem* tax. *Thompson II* resulted in three separate opinions. Senior Circuit Judge Van Graafeiland wrote the affirming opinion, with Judge Winter concurring in a separate opinion; and Judge Sack dissenting in another separate opinion.

Several of the parties are urging that despite the fractured decision in *Thompson II*, this court should rely at least in part upon that decision to strike some of the affirmative defenses being challenged herein. The court sees no reason to do that, however, because as will soon become apparent, there is ample relevant case law without needlessly trying to discern the import of *Thompson II*. Moreover, as the Canadian Band and People of the Longhouse accurately state, "*Thompson [II]* does *not deal directly* with any of the defendants' legal defenses or counterclaims." Memorandum on Impact of Thompson Case Submitted by Plaintiffs Mohawk Council of Akwesasne and Mohawk Nation Council of Chiefs at ¶ 2 (emphasis added). Likewise, the State's ob-

servation regarding *Thompson II vis-a-vis* the pending motions is accurate: "The *Thompson* opinions do not squarely address let alone decide the validity of the tribal plaintiffs' claims to the lands and islands at issue in the *St. Regis* cases." Letter of David B. Roberts to Court (Feb. 13, 2003) at 1. As soon will be readily apparent, the pending motions raise enough issues on their own without becoming sidetracked with *Thompson II.*

### III. Overview of Arguments

The Tribes[6] are seeking to strike the following defenses: (1) laches; (2) Eleventh Amendment; (3) standing of St. Regis; (4) abatement; (5) statute of limitations; (6) estoppel; (7) adverse possession; (8) mitigation; (9) lost title; (10) accord and satisfaction; (11) unclean hands; (12) estoppel by sale; (13) waiver; (14) lack of notice; (15) abandonment; (16) release; (17) relinquishment; (18) State title; (19) exhaustion of remedies; (20) indispensable party; (21) offset or setoff; (22) defense based on Treaty of Buffalo Creek; and (23) diminishment and disestablishment. Of those defenses, defendants do not oppose striking these four: (1) abatement; (2) adverse possession;[7] (3) lost grant;[8] and (4) lack of notice. *See* Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion to Strike Defenses ("Def.Memo.") at 21; 22; and 28. Accordingly, the court strikes the same. The parties continue to dispute the validity of the other remaining defenses.

Before delving into an analysis of each of the 19 affirmative defenses still at issue herein, however, the court will offer an overview of the parties' arguments. Al-lowing those defenses to stand would allegedly prejudice plaintiffs in two ways. First, prejudice would occur because many of the issues which these affirmative defenses raise have been previously resolved in the Tribes' favor *and* against the defendants in this and other land claim litigation. Consequently, relitigating these defenses would "create unnecessary expense and delay." *See* Mohawk Plaintiffs' Memorandum in Support of Motion to Strike Affirmative Defenses ("Pl.Memo.") at 3. The Tribes also claim that prejudice would arise because they anticipate "be[ing] forced to respond to discovery requests far in excess of those warranted by the viable issues remaining[,]" *even if* the court grants their motion to strike. *See id.*

Defendants' response can best be summarized in their own words: "Prudence dictates denying the Trib[es'] ... pre-emptive Motion to Strike ... prior to the completion of any discovery." Def. Memo. at 9. Further, defendants stress that it would be "premature" to grant the Tribes' motion to strike because there are "numerous significant and unique factual ... issues[,]" as well as "novel legal issues[.]" *See id.* at 1. Finally, defendants assert that the Tribes' "bald assertions of prejudice" are simply insufficient to warrant striking defendants' affirmative defenses. *Id.* at 7.

Defendants identify three allegedly "unique factual issues" which supposedly preclude granting any aspect of this motion to strike: (1) the status of the land at issue, *i.e.* aboriginal or recognized; (2) the Tribes' status under the NIA, as well as the basis for its claims thereunder, such as "the circumstances surrounding the execu-

---

**6.** With defendants' consent and the court's permission, the three Tribal entities have filed what they term "consolidate[d] motions to strike defenses and to dismiss counter-claims[,]" resulting in only one memorandum of law being filed by the Tribes addressing this motion to strike. Letter of Steven M. Tullberg to Court (April 8, 2002) at 1 and 2.

**7.** St. An. (89–CV–829 and 82–CV–783) at ¶ 11.

**8.** *Id.* at ¶ 12.

tion of the 1796 Treaty with the Seven Nations of Canada ["the 1796 Treaty"][,]"; and (3) "whether the St. Regis or their predecessors were even parties to [the Treaty of Fort Stanwix, the Treaty of Fort Harmar and the Treaty of Canandaigua][.]" *Id.* at 4 and 5.

Likewise, defendants identify three legal issues which they contend provide another reason for denying this motion to strike. Arguing that "aboriginal title" is essential to an NIA claim, the defendants contend that the NIA does not apply here because the Tribes do not have such title. Instead, the defendants maintain, because the Tribes are seeking to "enforce rights ... created, if at all, in a private land purchase agreement between the State ... and a private individual[.]" *See id.* at 6. That scenario, according to defendants, raises "a significant legal question [as to] the applicability of the [NIA]" here. *Id.*

Turning next to potential legal issues, which according to defendants would bar plaintiff relief, evidently there are no reported cases applying the Nonintercourse Act ("NIA") in a case such as this; *i.e.* where, at least according to the defendants, the subject land involved a *"private land purchase ...* between the State .. and a private individual[ ]"—an agreement to which the defendants maintain the "Indians of the Village of St. Regis were *merely* third-party beneficiaries[.]" *Id.* at 6 (emphasis added). Thus, again relying

upon the purported lack of aboriginal title, an element which defendants believe is crucial to the applicability of the NIA, they argue that there is a "significant legal question" as to whether or not the Tribes have properly invoked the NIA. *Id.*

### *DISCUSSION*

### *Motion to Strike Affirmative Defenses* [9]

### *I. Rule 12(f) Standard*

The oft-repeated legal standards to be applied in resolving a Rule 12(f) motion to strike are straightforward and well-settled. The parties agree as to the governing legal standard, but they strongly disagree as to the outcome.

 Among other things, pursuant to Fed.R.Civ.P. 12(f), a "court may order stricken from any pleading any insufficient defense[.]" Typically courts do not look favorably upon motions to strike. *See, e.g., Oneida Indian Nation of New York v. New York,* 194 F.Supp.2d 104, 117 (N.D.N.Y.2002) (Kahn, J.).[10] That does not mean that such motions are never granted, however. Motions to strike *"are to be granted* [, but] only when 'it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.'" *Id.* (quoting *Salcer,* 744 F.2d at 939) (emphasis added). In other words, courts *should grant* these motions *when* the *defenses*

---

**9.** A defense "merely negates an element of the plaintiff's prima facie case[,]" *Hadar v. Concordia Yacht Builders, Inc.,* 886 F.Supp. 1082, 1089 (S.D.N.Y.1995) (internal quotation marks and citations omitted), whereas "a defendant must plead a defense affirmatively if it has the burden of proof on that defense." *Laborde v. City of New York,* No. 93 CIV. 6923, 1999 WL 38253, at * 4 (S.D.N.Y.1999) (citation omitted); *see also* Fed.R.Civ.P. 8(c) (emphasis added) (listing "affirmative defenses" which, "[i]n pleading to a preceding pleading, ... a party *shall* set forth[ ]"). In

their answers the State includes a generic heading, "DEFENSES," unlike the other defendants which [distinguish from] or have more accurately designated their similar allegations as "affirmative defenses." As the parties do, the court will treat the State's "defenses" at issue strictly as "affirmative defenses."

**10.** To distinguish this case from other *Oneida* cases referenced herein, the court will refer to this case as the *"Oneida Reservation* case."

presented are *clearly insufficient."* *Id.* (emphasis added). However, when there "has been no significant discovery[,]" courts are [even] more reluctant to grant a motion to strike an affirmative defense. *See id.*

■■■ By the same token, though, "even when the facts are not disputed, several courts have noted that a motion to strike for insufficiency was never intended to furnish an opportunity for the determination of *disputed and substantial* questions of law." *Salcer,* 744 F.2d at 939 (internal quotation marks and citations omitted) (emphasis added). A legal issue is "substantial and disputed" when, for example, "courts considering the question have reached differing conclusions[,]" resulting in "confus[ing] and unsettled" law on a given point. *See id.* (citations omitted). Conversely, "[c]lose or new questions of law should *not* be resolved on a motion to strike[.]" *Mohegan Tribe v. State of Conn.,* 528 F.Supp. 1359, 1362 (D.Conn.1982) (emphasis added). Otherwise, as the Second Circuit pointed out in *Salcer,* courts would "run the risk of offering an advisory opinion on an abstract and hypothetical set of facts." *Salcer,* 744 F.2d at 939 (citations omitted).

■■■ Additionally, before striking an affirmative defense there must be a showing that its "inclusion ... [will] result in prejudice to the plaintiff." *Oneida Indian Nation,* 194 F.Supp.2d at 117 (citing *S.E.C. v. Toomey,* 866 F.Supp. 719, 722 (S.D.N.Y.1992)). "The requirement of *prejudice* to the plaintiff may be *satisfied* if the *inclusion* of the *defense* would *result* in *increased time and expense* of trial, *including* the *possibility of extensive and burdensome discovery* [,]" *id.* (citation omitted) (emphasis added), such as when the discovery "could take many months." *See Toomey,* 866 F.Supp. at 722 (internal quotation marks and citation omitted). On

the other hand, "prejudice is not assumed simply by the inclusion in the amended complaint of the verbose, immaterial, conclusory, or evidentiary matter[.]" *County Vanlines v. Experian Information Solutions,* 205 F.R.D. 148, 153 (S.D.N.Y.2002) (internal quotation marks and citation omitted).

In short to prevail on this motion to strike, as the moving parties the Tribes have the burden of showing the absence of factual questions; the absence of substantial questions of law, *see Carter–Wallace, Inc. v. Riverton Laboratories, Inc.,* 47 F.R.D. 366, 368 (S.D.N.Y.1969); *and* that they will be prejudiced by the inclusion of the affirmative defenses which they are seeking to strike. *See County Vanlines,* 205 F.R.D. at 153 (citation omitted).

## II. Affirmative Defenses

In addressing the viability of the 19 remaining defenses which the Tribes are seeking to strike, for analysis purposes the court will group these defenses according to common legal theories and arguments.

### A. Standing

■■■ "Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Fair Housing in Huntington v. Town of Huntington,* 316 F.3d 357, 361 (2d Cir.2003) (internal quotation marks and citation omitted); *see also Thompson v. County of Franklin,* 15 F.3d 245, 248 (2d Cir.1994) (recognizing "jurisdictional nature of the standing inquiry"); and *First Capital Asset Management v. Brickellbush,* 218 F.Supp.2d 369, 377 (S.D.N.Y.2002) (addressing standing argument first because it implicated court's subject matter jurisdiction). Consequently, although not the first defense being challenged on this motion to strike, the court will address standing first.

This is not the first time the standing issue has arisen in this litigation. Slightly more than two years ago, in *St. Regis IV,* the court denied a defense motion to dismiss for lack of standing directed at two of the plaintiffs, the Canadian Band and the Longhouse. *See St. Regis IV,* 146 F.Supp.2d at 181–85. The court presumes familiarity with that decision.

Only after that defeat did the defendants challenge the standing of the St. Regis Mohawk Tribe and the St. Regis Mohawk Tribal Council ("the Council").[11] On August 13, 2001, approximately two and a half months after *St. Regis IV,* the defendants filed amended answers. In their amended answers in Main Land II, for the first time, the State and the Power Authority alleged lack of standing as an affirmative defense as against the Tribe and the Council.

■ "[T]o establish a violation of the [NIA], a plaintiff must show that: (1) it is an Indian nation or tribe; (2) the land at issue was tribal land at the time of the alleged violation; (3) the [U.S.] has never consented to or approved alienation of this tribal land as required by the Act; and (4) the trust relationship between the [U.S.] and the Indian nation or tribe has not been terminated or abandoned." *Seneca Nation of Indians v. New York,* 206 F.Supp.2d 448, 502 (W.D.N.Y.2002) (emphasis added) (citing, *inter alia, Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 56 (2d Cir.1994)). In challenging the St. Regis' standing, the defendants' focus is very narrow; at least at this point it is only disputing the St. Regis' ability to satisfy the first factor. Evident-

ly at least for purposes of this motion, defendants concede that in all other respects the St. Regis has sufficiently pled an NIA violation. The court makes that same assumption.

The NIA does not define "Indian nation" or "tribe of Indians" for purposes of that Act. *See First American Casino v. Eastern Pequot Nation,* 175 F.Supp.2d 205, 211 n. 9 (D.Conn.2000). In the past 30 years or so that issue has engendered a fair amount of litigation particularly in Northeastern land claim cases. Indeed, as more fully discussed below, not only has this court previously addressed tribal status under the NIA, but it has addressed nearly the exact same arguments which the parties are advancing herein. In this way, analysis of the standing issue exemplifies all too well the court's initial observation that this motion is *"deja vu* all over again."

Before addressing the merits of the tribal status issue, there are two procedural issues—both going to the scope of this motion—which the court must briefly address. The first issue is exactly which plaintiff is seeking to strike standing as an affirmative defense. The second issue pertains to the scope of the record.

As to the parties involved, the scope of the Tribe's motion to strike standing is more narrow than it first appears. As the court reads the State's amended answer in Main Land II, the State disputes the standing of the St. Regis Tribe and the Council. *See* St. An. (89–CV–829) at 2, ¶ 5. In moving to strike standing, however, the Tribe focuses solely on *its* own standing and only mentions the Council once in passing.[12] In their opposition memoran-

---

11. The Main Land II complaint explains the relationship between the Tribe and the Council as follows: "The Tribe brings this action by authority of its duly elected chiefs, plaintiff THE ST. REGIS MOHAWK TRIBAL COUNCIL." Co. (89–CV–829) at 3, ¶ 5. Further-

more, "[t]he ... Council represents and is authorized to speak for the members of the St. Regis Mohawk Tribe." *Id.*

12. Understandably, the Canadian Band and the Longhouse are not joining in the standing

dum the defendants do not mention the Council at all. Moreover, the Power Authority is *not* disputing the Council's standing; only the State is. Consistent with the foregoing, the court will confine its standing analysis to the Tribe.

To bolster its assertion of federal recognition, the Tribe is relying upon the "affidavit" of M. Sharon Blackwell, Deputy Commissioner of the Bureau of Indian Affairs ("BIA"), wherein she addresses the tribal status of the St. Regis. *See* Walker Aff'm, exh. A thereto at (M. Sharon Blackwell Affidavit (June 14, 2002) at ¶¶ 2–4).[13] Reciting the general rule that"[i]n deciding a Rule 12(f) motion, a court must accept the matters well-pleaded as true and should not consider matters outside the pleadings[,]" *Oneida Reservation,* 194 F.Supp.2d at 117 (internal quotation marks and citation omitted), the defendants are urging the court to ignore Ms. Blackwell's declaration. Otherwise they want to conduct discovery as to the assertions therein, including "the basis for the federal government's recognition of the St. Regis." *See* Def. Memo. at 19, n. 4; and at 20, n. 7.

▮ At this juncture, the part of the Blackwell declaration which seems most relevant is the statement that the Federal Register lists the St. Regis as a "recognized Indian tribe[.]" *See* Blackwell Aff. at ¶ 6. It is not necessary for the court to look to the Blackwell declaration to find support for that proposition, however. That is so because on a motion to strike, "[a] court may also consider matters of which judicial notice may be taken under FED. R. EVID. 201[.]" *County Vanlines,* 205 F.R.D. at 152 (citation omitted).

Among the items of which judicial notice may be taken is the Federal Register. *See Yale–New Haven Hosp., Inc. v. Thompson,* 198 F.Supp.2d 183 (D.Conn.2002). Thus because the court can take judicial notice of the Federal Register and the St. Regis' listing therein, it need not consider the Blackwell declaration.

Turning next to the relative merits of the parties' standing arguments, defendants adopt a strategy which they turn to time and again in opposing this motion to strike. They assert that factual issues and questions of law "predominate[,]" thus rendering it improper to strike standing as an affirmative defense. *See* Def. Memo. at 18. Defendants are unsuccessful in their attempt to create factual issues and to show a "disputed and substantial" question of law, however.

▮ The St. Regis is arguing that it is a "nation or tribe" within the meaning of the NIA because (1) it is federally recognized by the U.S. government; and (2) it is "a recognized successor in interest to the beneficiaries of the 1796 Treaty[.]" Tr. Memo. at 4–5. Countering that federal recognition is *not* dispositive of NIA standing, the defendants posit that continuity of tribal existence is essential to NIA standing. More specifically, defendants contend that the St. Regis must show "tribal status at all relevant times in the litigation, from the date of enactment of the [NIA] through the dates of various transactions up to the present." Def. Memo. at 18–19 (emphasis added) (citing *Mashpee Tribe v. New Seabury Corporation,* 592 F.2d 575 (1st Cir.1979)).

---

aspect of this motion to strike. *See* Mohawk Plaintiffs' Reply to Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion to Strike Affirmative Defenses ("Tr.Reply") at 3, n. 2.

13. Although designated as "affidavit," actually the document submitted by Ms. Blackwell is an unnotarized declaration under penalty of perjury. *See Tinelli v. Redl,* No. 96 CIV. 2827, 1998 WL 241753 (S.D.N.Y.1998).

In weighing those conflicting views, *Cayuga Indian Nation of New York v. Cuomo*, 667 F.Supp. 938 (N.D.N.Y.1987) ("*Cayuga III*"), is particularly instructive because this court was faced with arguments nearly identical to those just set forth. The plaintiffs argued, as the Tribe does now, that because "they [we]re recognized as Indian tribes by the federal government and ... the federal government ... had a continuous relationship with them for a great number of years[,]" they met the tribal status element necessary to pursue an NIA violation. *Id.* at 941–42. Also as in the present case, and also based upon *Mashpee*, the *Cayuga III* defendants argued that "federal recognition is *in* sufficient to establish tribal status for the purposes of a[n] [NIA] claim and ... the *plaintiffs must prove* that they have had a *continuous tribal existence* since the time of the challenged conveyances to the present time." *Id.* at 942 (emphasis added).

Rejecting that argument, this court distinguished *Mashpee* because "the Mashpees and four other 'tribes' involved in that litigation [were] not on the [federal government] list [of recognized Indian tribes[,]" whereas "the Cayuga Nation of New York and the Seneca–Cayuga tribe of Oklahoma" are on that list. *See id.* at 943 (citing 51 Fed.Reg. 25115 (July 10, 1986)). Then, after analyzing the law regarding tribal status under the NIA, this court opined that "even if [it][was] not bound by federal government recognition of a tribe, such recognition should be given *great weight* in any determination of tribal status." *Id.* at 943 (emphasis added). Consequently, "[n]otwithstanding the defendants' protests and presentation to the court of 'questions of material fact' on the issue of tribal status, the court ha[d] little hesitation in holding that there [wa]s no genuine issue of material fact regarding the tribal status of either of the plaintiffs[ ]" in *Cayuga III. Id.*

More recently, in *Oneida Indian Nation* the court also refused to accept the defense argument that a plaintiff must prove continuous tribal existence at the time of each challenged conveyance in order to show that it is a tribe within the meaning of the NIA. *See Oneida Reservation*, 194 F.Supp.2d at 119–21. Citing *Cayuga III* among other cases, Judge Kahn accurately stated that "[c]ourts have *consistently found* that *recognition* of a *tribe* by the [U.S.] *government* is to be given *substantial weight* in *determining* an Indian plaintiff's *tribal status* for [NIA] claims." *Id.* at 119–120 (citing cases) (emphasis added). Relying partially upon that reasoning, in *Oneida Reservation* the court held that the plaintiffs had "standing as a matter of law[ ]" under the NIA. *See id.* at 121 (footnote omitted).

In the face of that contradictory case law, defendants persist in arguing that the St. Regis must show continuing tribal existence to constitute an "Indian nation" or "tribe of Indians" as those terms are used in the NIA. Defendants' argument is unavailing given the case law referenced above wherein courts, including this one, have uniformly rejected the notion of continuing tribal existence as a prerequisite to satisfying that element of an NIA claim. Simply put, in light of the case law outlined above, defendants are unable to show that there are "disputed and substantial questions of law" pertaining to that issue. *See Salcer*, 744 F.2d at 939.

Likewise, try as they might, defendants have not shown that there are factual issues precluding the court from granting the Tribe's motion to strike the standing defense. Accepting as it must "all facts averred by the [Tribe] ... as true for purposes of the standing inquiry[,]" *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183, 192 (2d Cir.2002) (internal

quotation marks and citation omitted), the court finds that the St. Regis constitutes a federally recognized tribe under the NIA. The St. Regis avers that it "is an American Indian tribe recognized by the Secretary of the Interior of the [U.S.][;]" and that it is "an 'Indian nation or tribe of Indians' within meaning of the [NIA.]" *See* Co. (89–CV–829) at 3, ¶ 5. Of equal if not more import though is the fact that the State and the Power Authority unequivocally "ADMIT" that the Tribe is federally recognized. *See* St. An. (89–CV–829) at 2, ¶ 5; Power Auth. An. (89–CV–829) at ¶ 3. That "key admission," as the Tribe puts it, *see* Tr. Reply at 3, is in keeping with the State's answer which does not contain an averment that the Tribe lacks federal recognition. Further, those "key admission[s]" reinforce defendants' earlier postion in *St. Regis IV* "that the *federally recognized St. Regis Tribe* c[ould] adequately represent the interests of all three plaintiff tribes[.]" *See St. Regis IV*, 146 F.Supp.2d at 181 (emphasis added).

In addition to those pleadings, as Fed. R.Evid. 201(b) allows, the court takes judicial notice of that portion of the Federal Register wherein the "St. Regis Band of Mohawk Indians of New York" is "list[ed]" and "recognized" as "eligible for funding and services from the [BIA] by virtue of [its] status as [an] *Indian tribe* [ ]." *See* 60 Fed.Reg. 13298 (March 13, 2001) (emphasis added). To summarize, the Tribe's allegations that it is "a group intended to be protected by the [NIA,]" *see Golden Hill*, 39 F.3d at 58, especially in combination with its listing as an "Indian tribe" in the Federal Register, persuades the court that the Tribe has shown that it can satisfy the first element of an NIA violation. Further, as noted earlier, the St. Regis' tribal status under the NIA is the only aspect of standing under that statute which defendants are disputing now. Thus, as in *St. Regis IV*, "[t]he general

allegations contained in the … [T]ribe['s] pleadings … satisf[ies] both the constitutional and prudential requirements of standing given the procedural posture of this litigation." *St. Regis IV*, 146 F.Supp.2d at 184.

Having said that, as in *St. Regis IV* the court hastens to add that "if defendants contest standing in the future," the Tribe may need to produce specific facts. *See St. Regis IV*, 146 F.Supp.2d at 184 (citing, *inter alia, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992)). This is especially so in terms of the St. Regis' contention that it is "a recognized successor in interest to the beneficiaries of the 1796 Treaty[.]" *See* Tr. Memo. at 5. Perhaps an inquiry into whether the St. Regis "fall[s] within the protection of the [NIA] … will prove fact-intensive[.]" *St. Regis IV*, 146 F.Supp.2d at 184. Such a factual inquiry is "beyond the purview" of this motion to strike, however, which confines the court to an examination of the sufficiency of the allegations contained in the pleadings. *See id.*

Accordingly, the court grants the Tribe's motion to strike standing as an affirmative defense as set forth in the State's answer in Main Land II (89–CV–829) at 11, ¶ 26, and as set forth in the Power Authority's Main Land II answer (89–CV–829) at ¶ 20.

## B. "Defenses Already Considered by the Courts"

The Tribes place laches and Eleventh Amendment immunity in this category, although at first glance these two defenses seem to have little in common. Their common denominator however is that both have been repeatedly considered *and* rejected by courts in the land claim setting.

### 1. Laches

Turning first to laches, the State asserts that "[a] good faith argument for the extension, modification or reversal of existing law would dictate that the claims are barred by the *federal common law* defense of laches." St. An. (82–CV–783) at 11, ¶ 2; and St. An. (89–CV–829) at 8, ¶ 2 (emphasis added). The Municipal defendants assert a substantially similar defense, except they omit any reference to federal common law. *See* Mun. Def. An. (82–CV–783) at 21, ¶ 103; and Mun. Def. An. (89–CV–729) at 26, ¶ 117. The Power Authority's laches defense is more simplistic: "Plaintiffs' claims are barred, in whole or in part, by laches." Power Auth. (82–CV–114) ¶ 24; and Power Auth. (89–CV–729) at ¶ 26. These are not the only laches defenses which defendants are asserting, but they are the only ones which the Tribes are seeking to strike.

■ The primary basis for the Tribes' assertion that laches should be stricken is based upon this court's prior ruling in *St. Regis IV,* just slightly over two years ago, wherein it held that "laches is *not* available as a defense to defendants." *See St. Regis IV,* 146 F.Supp.2d at 187 (emphasis added). Despite that unequivocal pronouncement, and a long line of cases holding the same, defendants contend that it would be premature to strike laches because they posit the law on that issue will change. Defendants add that the court must deny this motion because there has been no discovery—an argument to which they repeatedly return.

■ Generally, "[l]aches developed as an equitable defense based on the Latin phrase *maxim vigilantibus non dormientibus qeauitas subvenit,* roughly translated as equity aids the vigilant, not those who sleep on their rights." *Bolanos v. Norwegian Cruise Lines Limited,* No. 01 Civ. 4182, 2002 WL 1465907, at * 7 (S.D.N.Y.

July 9, 2002) (internal quotation marks and citations omitted). "Stated another way, laches asks whether the plaintiff[s] in asserting [their] rights w[ere] guilty of unreasonable delay that prejudiced the defendants." *Id.* (internal quotation marks, citation and footnote omitted). By its very nature, land claim litigation is based upon historical events which in most instances transpired over two centuries ago. Thus, inherent in this type of litigation is the sense that plaintiffs should have somehow asserted their rights sooner. Undoubtedly it is that notion which first led defendants to invoke laches in land claim actions.

■ The issue of whether laches bars land claims has been frequently litigated leaving little if any room for dispute. Laches is *not* a defense to Indian land claims, at least as to liability. *See Oneida Reservation,* 194 F.Supp.2d at 123–24 (citing cases). Courts within this Circuit have "consistently rejected the use of delay-based defenses[ ]" in NIA actions. *Id.* at 123 (citations omitted). Twenty years ago, in the early stages of the *Cayuga* litigation, keeping with a series of rulings in other Northeast land claim actions, this court listed several "established" principles governing Indian land claims. *See Cayuga Indian Nation of New York v. Cuomo,* 565 F.Supp. 1297, 1301 (N.D.N.Y.1983) ("*Cayuga II* "). Among those principles was that [at least to the extent it is state law based] laches is "unavailable" in land claim actions. *See id.* at 1301–02 (citing cases).

Twelve years ago, in *Cayuga Indian Nation of New York v. Cuomo,* 771 F.Supp. 19 (N.D.N.Y.1991) ("*Cayuga VI* "), this court held that *Oneida Indian Nation of New York State v. Oneida County,* 719 F.2d 525 (2d Cir.1983) ("*Oneida III* ") "stands for the proposition that claims brought by Indian tribes in general, . . . , should be held by courts to be timely, and

therefore not barred by laches, if, at the very least, such a suit would have been timely if the same had been brought by the [U.S.]" *Cayuga VI,* 771 F.Supp. at 22 (footnote omitted). Two years ago this court in *St. Regis IV* explicitly "decline[d] th[e] [Municipal and State defendants'] invitation" to "reconsider" its prior ruling in *Cayuga VI. St. Regis IV,* 146 F.Supp.2d at 186. Then, as now, the "defendants urge[d] that neither the Supreme Court ... nor the Second Circuit has conclusively determined whether or not laches is available as an equitable defense to Indian land claims brought under the [NIA]." *Id.; see* Def. Memo. at 9.

In adhering to the view that laches is not a defense in an NIA action, in *St. Regis IV* this court pointedly reminded defendants that "[t]he issue whether laches is available as an equitable defense to Nonintercourse Act claims, and the *very same arguments made* here *by defendants,* were *thoroughly examined and rejected by this court* in *Cayuga VI* [ ]" a decade earlier. *See St. Regis VI,* 146 F.Supp.2d at 186 (emphasis added). Thus, "[a]pplying ... *Cayuga VI* to the instant case," this court held that "clear[ly] the tribes' and the [U.S.'] claims [were] timely." *Id.* Being intimately familiar with the *Cayuga* litigation, this court purposefully left open the possibility that laches may come into play here insofar as remedies are concerned. *See id.* at 187 ("[T]he instant suits here are timely, at least for liability purposes.")

Just last year, Judge Kahn likewise rejected the argument that even after the Supreme Court's decision in *Oneida County v. Oneida Indian Nation of New York State,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("*Oneida IV*") it remains an open question as to whether laches applies to claims by Indian tribes. *See Oneida Reservation,* 194 F.Supp.2d at 123.

In so doing Judge Kahn explained, "even though the Supreme Court did not definitively decide the issue, the strong language it used in contemplating a laches defense has been recognized by lower courts as effectively barring the defense of laches in Indian land claims." *Id.* at 124. In light of the foregoing, it is no surprise that Judge Kahn easily concluded that "[t]he law on this issue [the availability of laches] *overwhelmingly supports striking* Defendants' *laches* ... defense[ ] as *legally insufficient*." *See id.* at 124 (emphasis added). And hence, given the "*extensive law* rejecting" laches in land claim actions, the court in *Oneida Reservation* granted the Tribes' motion to strike that affirmative defense. *See id.* (emphasis added).

Refusing to take no for an answer, defendants persist in arguing that laches applies here and so should not be stricken as an affirmative defense. In an effort to avoid the inevitable, *i.e.,* striking laches, the defendants make several arguments, none of which are persuasive. First, striking laches as a defense would from defendant's standpoint be "premature[ ]" because of the "*potential significance*" of the pending appeals to the Second Circuit in both" the *Cayuga* litigation and *Oneida Indian Nation of New York v. City of Sherrill,* 145 F.Supp.2d 226 (N.D.N.Y. 2001), *aff'd in part, vacated and remanded in part,* 337 F.3d 139 (2d Cir.2003) ("*Sherrill* "), and ultimately perhaps review by the Supreme Court. Def. Memo. at 8 (emphasis added). Raising the possibility (and a meager one at that), of a change in law is nothing more than conjecture by defendants. The parties in *Cayuga* are raising a multitude of issues on appeal.

What is more, the Second Circuit has now rendered its decision in *Sherrill* and did not directly address laches, let alone "reverse" the clear trend disallowing that defense in Indian land claim actions. The

Second Circuit did emphasize, however, the Supreme Court's position regarding delay-based defenses, such as laches:

Addressing delay-based arguments in *Oneida II*, the Supreme Court held that no federal limitations period applied and that it would be improvident to apply a parallel state requirement in this uniquely federal context. 470 U.S. at 240–44, 105 S.Ct. 1245. As the Court pointed out, there is no time-bar for claims brought by the United States on behalf of Indians "to establish title to, or right of possession of, real or personal property." *Id.* at 241–43 & n. 15, 105 S.Ct. 1245. The *Oneida II* majority also strongly suggested that a laches defense is improper for similar reasons. *Id.* at 244–45 & n. 16, 105 S.Ct. 1245 ("[T]he application of laches would appear to be inconsistent with established federal policy.") (citing *Ewert v. Bluejacket*, 259 U.S. 129, 137–38, 42 S.Ct. 442, 66 L.Ed. 858 (1922) (doctrine of laches cannot bar a suit by individual Indians challenging land transactions for violating federal statutory restrictions on alienation)).

*Sherrill,* 337 F.3d at 168. Thus, since this court's May 2001 *St. Regis IV* decision, the only arguably relevant laches decisions within this Circuit are *Sherrill* and *Oneida Reservation.* And, as should be readily apparent, those decisions actually reinforce the Tribes' position: Laches has no place in Indian land claim actions.

Defendants make another attempt to avoid what seems like a foregone conclusion, *i.e.* striking laches as a defense. They baldly assert that this is "a different time and place, . . . subject to different standards[,]" thus implying that the court should reverse itself and allow the laches defense to stand. *See* Def. Joint Memo. at 9. Those claimed differences are not readily apparent and defendants did not elaborate.

Defendants' reference to "different standards" is especially puzzling. If, as it appears, defendants are trying to distinguish between *St. Regis IV* and the present motion on a procedural basis, that distinction is meaningless. The standard for this Rule 12(f) motion to strike "is the *mirror image* of the standard for considering whether to dismiss for failure to state a claim[ ]" under Rule 12(b)(6)—the basis for the defense motion in *St. Regis IV. See Solvent Chemical Co. v. E.I. Dupont De Nemours & Co.,* 242 F.Supp.2d 196, 212–13 (W.D.N.Y.2002) (emphasis added); *see also United States v. Portrait of Wally,* No. 99 Civ. 9940, 2002 WL 553532, at *4, n. 3 (S.D.N.Y. April 12, 2002) (citation omitted) (application of Rule 12(f) or Rule 12(b)(6) "is academic, as the standard is the same . . ., and courts . . . used both to reach the same result[ ]"). Accordingly, even though laches was before the court in *St. Regis IV* on a motion to dismiss, and now it is before the court on a motion to strike, that difference does not change the result. Indeed, the lack of any procedural differences, in combination with the fact that in the past two years there has been no change in the law, significantly undermines defendants' contention that laches should remain as a defense.

The court is aware that ordinarily the applicability of laches involves a fact intensive inquiry, thus making it improper to consider on a motion such as this which is confined to a review of the pleadings. *See Carell v. Shubert Organization, Inc.,* 104 F.Supp.2d 236, 263 (S.D.N.Y. 2000) (citing *Tri–Star Pictures Inc. v. Leisure Time Prods., B.V.,* 17 F.3d 38, 44 (2d Cir.1994)). By the same token, laches may be raised by a motion limited to a review of the pleadings when "it is clear on the face" and no set of facts can be proven "to avoid th[at] insuperable bar." *Id.* (citation omitted). Such is the case here, as the

foregoing discussion amply shows. Just as in *St. Regis IV*, there is no reason for the court to deviate from its earlier ruling in *Cayuga VI* and defendants have shown no justification for such a departure. Consequently, the court grants the Tribes' motion to strike laches as an affirmative defense, but not in its entirety.

Prior to *Cayuga*, no other court had been directly confronted with the issue of whether laches may be implicated with respect to remedies in land claim litigation. In *Cayuga VI*, the laches issue arose solely as a defense to liability, implicitly leaving open the possibility that laches might again become an issue later with respect to remedies—and eventually it did. To illustrate, after considering all of the equities including laches, the court granted the defendants' motion *in limine* precluding ejectment as a remedy. *See* (*Cayuga Indian Nation of New York v. Cuomo*, 80–CV–930, 80–CV–960, 1999 WL 509442, at *30 (N.D.N.Y. July 1, 1999) ("*Cayuga X*"). Eventually the court held that laches did have bearing on the pre-judgment interest award.

In a supplemental pre-trial order entered with respect to the pre-judgment interest phase of *Cayuga*, this court allowed the State to proffer evidence, *inter alia*, as to "the plaintiffs' alleged unreasonable delay in asserting their interests in the subject land." Def.App. D. (*Cayuga Indian Nation of New York v. Pataki*, 2000 WL 654963, **3–4, 2000 U.S. Dist. LEXIS 7045, at *11 (N.D.N.Y. May 17, 2000)). It also allowed proof "as to what efforts, if any, plaintiffs made in asserting their claims to the subject property, and the State's response or lack thereof to such efforts." *Id.* at *11—*12. Ultimately the court took that evidence into account, along with a host of other factors, in deciding the Cayugas' prejudgment interest award. *See generally Cayuga Indian*

*Nation of New York v. Pataki*, 165 F.Supp.2d 266 (N.D.N.Y.2001). Consistent with *Cayuga* and this court's allusion in *St. Regis IV* that laches may become relevant down the line as to remedies, although it is granting the Tribes' motion to strike laches as it pertains to liability, to the extent that defense can be read as pertaining to remedies, the court denies the Tribes' motion to strike the same.

### 2. *Eleventh Amendment*

■ In the Main Land actions, as well as in the Island actions, the State alleges that "[t]he Eleventh Amendment to the U.S. Constitution bars some or all of the claims[ ]" herein. St. An. (82–CV–1114) at 11, ¶ 24; St. An. (82–CV–783) at 13, ¶¶ 24 and 25; and St. An. (89–CV–829), at 11, ¶ 24. Well aware that in *St. Regis IV* this "Court . . . ruled as a matter of law on the inapplicability of the [Eleventh Amendment] in this case[,]" the State continues to assert this defense, but "*for the purpose of preservation only.*" *Id.* (emphasis added).

Obviously the State is fully aware of this court's prior Eleventh Amendment ruling. Addressing the potential impact of Eleventh Amendment immunity on the Tribes' claims herein, this court "follow[ed] its previous rationale in *Cayuga* [X]." *St. Regis IV*, 146 F.Supp.2d at 181. This court held that "the [Trib[es] . . . [could] maintain their current claims and the relief they seek against the State[ ]" regardless of the Eleventh Amendment. *See id.* (footnote omitted). Furthermore, adopting the Power Authority's theory that "because the State appropriated the islands at issue in this action," the court further held that "the Eleventh Amendment also bars all of the . . . [T]ribes' claims against" the Power Authority. *See id.* at 181, n. 8. Despite the foregoing, the State persists in arguing that the Eleventh Amendment should not be stricken because it is being

asserted "for the *purpose of preservation only.*" *See* St. An. at ¶ 24 (emphasis added). The court disagrees.

Viewing Eleventh Amendment immunity as jurisdictional, the State contends that the same can be asserted "at anytime during the litigation[,]" and thus the Tribes will "suffer no prejudice" if the court allows this defense to stand. *See* Def. Memo. at 7 and 10 (citations omitted). In *Cayuga X,* recognizing the "competing theories as to the nature of the Eleventh Amendment," *i.e.* whether it is a limitation on the court's subject matter jurisdiction or a grant of immunity, "in accordance with Second Circuit precedent, ... this court ... treat[ed] th[at] Amendment as jurisdictional[.]" *Cayuga X,* 1999 WL 509442, at *7, n. 6. The Second Circuit has continued to adhere to the view that essentially the Eleventh Amendment is jurisdictional in nature, and hence may be raised at any point during the litigation. *See McGinty v. New York,* 251 F.3d 84, 94 (2d Cir.2001) (citing cases) ("[T]he Supreme Court and this Court have repeatedly held that a state may assert Eleventh Amendment sovereign immunity at any time during the course of proceedings."); *see also Richardson v. New York State Dept. of Corr. Ser.,* 180 F.3d 426, 448–49 (2d Cir. 1999) (State did not wait too long to raise Eleventh Amendment immunity when it waited to do so for the first time on a summary judgment motion).

Plainly the State is right: To the extent the Eleventh Amendment is jurisdictional, it can be raised at any time during the litigation. Precisely because Eleventh Amendment immunity can be raised at any time, however, means that the State will *not* suffer any prejudice by granting this motion to strike. The State will not suffer any prejudice because, as is the Power Authority, it too is alleging that· "[t]o the extent the Plaintiffs raise claims and/or

seek relief beyond that sought in the [U.S.'] Complaint ..., such claims and/or relief is barred by the Eleventh Amendment." St. An. (82–CV–1114) (82–CV–783) (82–CV–829) at ¶ 25; and Power Auth. An. (82–CV–1114) at ¶ 16; and Power Auth. An. (89–CV–829) at ¶ 19. The Tribes are *not* seeking to strike this particular Eleventh Amendment defense. *See* Pl. Memo. at 4, n. 2. Therefore, even if the court grants the Tribes' motion to strike the Eleventh Amendment defense which the State is asserting for preservation purposes only, the State still will be free to pursue Eleventh Amendment immunity.

This result is fully consistent with *St. Regis IV* wherein the court reiterated its position "that the State may reassert its sovereign immunity if, down the road, the [T]rib[es] ... attempt to raise claims or issues different than those of the [U.S.]" *See St. Regis IV.* 146 F.Supp.2d at 181 (citing *Cayuga X,* 1999 WL 509442, at *13). It is noteworthy that on this motion the State does not even hint at the possibility that the Tribes are raising claims or issues which are different that those which the U.S. is raising. Additionally, despite the State's assertion to the contrary, the Tribes *could* be prejudiced by allowing the Eleventh Amendment to stand because it in all likelihood it would only result in needless discovery, adding further confusion to an already complex case.

In another attempt to avoid striking this particular Eleventh Amendment defense, the State asserts that there is "a significant legal issue that has not yet been addressed by the Supreme Court in this context[,]" which is "the extent to which the State retains its Eleventh Amendment immunity with respect to Indian tribes when the [U.S.] intervenes in the tribes' lawsuit[.]" Def. Memo. at 16 (citations omitted). Given this purportedly "significant legal issue," the defendants contend,

without any analysis, that the court should deny the Tribes' motion to strike the Eleventh Amendment as a defense, even though it is being asserted for "preservation purposes only."

That argument falls on deaf ears. Again, as with laches, the law pertaining to Eleventh Amendment immunity in the land claim context is established. As the court explained in *St. Regis IV*, "this Circuit's decisional law permits tribal plaintiffs to remain in an action where the [U.S.] has intervened, so long as the tribal plaintiffs' issues and claims are identical to those made by the [U.S.]" *St. Regis IV*, 146 F.Supp.2d at 180 (citing *Seneca Nation of Indians v. State of New York*, 178 F.3d 95, 97 (2d Cir.1999) (*per curiam*), *aff'g*, 26 F.Supp.2d 555 (W.D.N.Y.1998); and *Arizona v. California*, 460 U.S. 605, 614, 103 S.Ct. 1382, 1388–89, 75 L.Ed.2d 318 (1983)); *see also Oneida Reservation*, 194 F.Supp.2d at 129 (citing, *inter alia*, *Oneida Nation of New York v. State of New York*, 691 F.2d 1070, 1080 (2d Cir. 1982)) [14] ("When litigation is brought by or could have been brought by the [U.S.] on behalf of an Indian Nation and the claims made by the [U.S.] are identical to those made by the Indian tribe, the Eleventh Amendment has been found not to apply.") Once again, the court declines to depart from well established law based solely on defendants' speculation that the Supreme Court will come to a different conclusion.

Moreover, the State's argument that a "factual inquiry" is necessary to resolve the Eleventh Amendment immunity issue is equally unavailing. *See* Def. Memo. at 18. In the first place, as the State acknowledges, to determine whether or not the Tribes' claims, issues and relief are virtually identical to those which the U.S. is raising, requires a *comparison* of same as alleged in the amended complaints of those parties. *See id.* By definition, such a comparison does not necessitate a "factual inquiry." Indeed in both *St. Regis IV* and *Cayuga X*, this court engaged in such a comparison *without* a factual inquiry going beyond the scope of the pleadings. *See St. Regis IV*, 146 F.Supp.2d at 181 (citing *Cayuga X*, 1999 WL 509442, at *13). For all of these reasons, the court grants the Tribes' motion to strike the State's Eleventh Amendment defense asserted for "preservation" purposes only.

### C. *"Defenses Clearly Rejected by the Supreme Court"*

#### 1. *Abatement*

There are two defenses which the Tribal plaintiffs deem to have been "clearly rejected by the Supreme Court." The first is abatement. In *Oneida County v. Oneida Indian Nation of New York*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("*Oneida IV*"), the Court "question[ed]" the relevancy of the common law doctrine of abatement to the NIA, a civil statute. *Oneida IV*, 470 U.S. at 245, n. 17, 105.S.Ct. at 1257, n. 17. Nonetheless, the Court held that the Oneida's NIA cause of action did not abate when the 1793 version of that statute expired and a subsequent version was enacted. *See id.* at 245–56; 105 S.Ct. at 1257. As noted at the outset, the defendants do not oppose the motion to strike the abatement defense. Evidently the defendants realize the futility in doing so. The defendants are *un*willing to concede, however, that *Oneida IV* also requires that the statute of limitations defense be struck, at least to the extent the Tribes are

---

**14.** This particular *Oneida* case also originated in this court. The challenged treaties in this *Oneida* litigation were entered into prior to the adoption of the Constitution and prior to the NIA, when the Articles of Confederation were in effect. Hence this case shall be referred to as *"Pre–Oneida II."*

alleging NIA and federal common law land claims. Thus, the court will turn to the statute of limitations issue in that context.

## 2. Statute of Limitations

Of the two statute of limitations defenses which the State asserts, the Tribes seek to strike only one. In particular, the Tribes seek to strike the State's defense wherein it urges that "[a] good faith ... extension, modification or reversal of existing law would dictate that the claims are barred by the relevant statute of limitations." [15] St. An. (82–CV–783) and (89–CV–289) at ¶ 18. The Tribes also seek to strike the Power Authority's statute of limitations defense, which is that "[t]he causes of action, *other than* the *federal common law land claim and* the *Trade and Intercourse Act claim,* are *barred,* by the applicable *statute of limitations.*" Power Auth. An. (89–CV–829) at ¶ 14; and Power Auth. An. (82–CV–1114) at ¶ 11 (emphasis added). Read together with the complaints, it is apparent that the Power Authority is limiting this defense to the Tribes' causes of action based upon 42 U.S.C. § 1983.[16] First the court will address the State's "good faith" argument. It will then turn to the Power Authority's argument that the Tribes' section 1983 claims are time barred.

### a. "Good Faith" Modification

■ In *Oneida IV*, the Supreme Court unequivocally held that "[i]t would be a violation of Congress' will" if it allowed a state statute of limitations to be borrowed in "federal common-law actions by Indians to enforce property rights." *See Oneida IV*, 470 U.S. at 244 and 240, 105 S.Ct. at 1254 and 1256. Relying almost exclusively upon that holding, the Tribes maintain that the State's statute of limitations defense is without merit. Although not couched in these exact terms, evidently the State's response is that the court should deny this motion to strike because a "good faith" argument can be made to modify or reverse *Oneida IV* as to its statute of limitations holding.

Underlying that argument is the State's assumption that in *Oneida IV* the majority focused "heavily on federal policy implemented by the [U.S.'] *trust relationship* with the Indians[.]" *See* Def. Memo. at 22 (emphasis added). Construing *Oneida IV* in that way, the State reasons that the Supreme Court's statute of limitations ruling does not apply to the Canadian Band or to the People of the Longhouse because neither of those entities had or has the requisite trust relationship with the U.S. At the very least, the State contends that *Oneida IV* left open the issue of whether it is permissible to "borrow[ ] ... a state statute of limitations for application to an Indian land claim brought by Indians without out a trust relationship with the [U.S.]" *See id.* Thus the State argues against striking the statute of limitations defense as it relates "to those claims arising outside the context of 42 U.S.C. § 1983[.]" *See id.*

---

15. For brevity's sake, the court will refer to this as the "good faith" argument or defense.

16. In Main Land I the Tribes set forth two claims, the second of which clearly is denoted as a section 1983 claim. *See* Co. (82–CV–783) at 11. In Main Land II, the Tribes are asserting seven separate claims, the fifth of which also is based expressly upon section 1983. *See* Co. (89–CV–729) at 19, ¶ 48. The sixth

and seventh causes of action therein do not reference section 1983, but they can be fairly read as also stating claims under that statute. *See id.* at 20–21, ¶¶ 49–56. Likewise, in the Island action, two of the three claims set forth therein can be read as being predicated upon section 1983, even though there is no mention of that statute in the complaint. *See* Co. (82–CV–1114) at 8–9, ¶¶ 51–58.

Reiterating their position as to the defenses of laches and the Eleventh Amendment, the Tribe bluntly declares that the State's statute of limitations defense should be stricken because the State has not shown that a possible future change in law warrants denial of this motion.

■ "There is *no federal statute of limitations* governing federal common law actions by Indians to enforce property rights." *Oneida IV*, 470 U.S. at 240, 105 S.Ct. at 1254 (emphasis added). With that unambiguous language, the Supreme Court began its discussion of the statute of limitations defense in the setting of Indian land claims. The Court then recited the "general rule" that "[i]n the absence of a controlling federal limitations period, ... a state limitations period for an analogous cause of action is borrowed and applied to the federal claim, provided that the application of the state statute would not be inconsistent with underlying federal policies." *See id.* at 240–41, 105 S.Ct. at 1254–55 (footnote and citations omitted). After reviewing several federal statutes and including legislative history, the Supreme Court concluded that "[i]t would be a violation of Congress' will to hold that a state statute of limitations period should be borrowed" in Indian land claims. *See id.* at 244, 105 S.Ct. at 1256.

Since that 1985 decision, and even before, courts including this one have uniformly rejected a limitations period as a defense in land claim actions. *See, e.g., Pre–NIA Oneida II, supra,* 691 F.2d at 1083–84 (internal quotation marks and citations omitted) ("[D]efenses [in Indian claims cases] based upon ... state statutes of limitations have been consistently rejected."); *Oneida Reservation,* 194 F.Supp.2d at 128 (same); *Sherrill, supra,* 145 F.Supp.2d at 260 (refusing to allow amendment of answer to add statute of limitations defense because it would be

futile in that "[n]o statute of limitations governs actions by Indians to enforce property rights[ ]") (citations omitted); *Seneca Nation of Indians v. State of New York,* No. 93–CV–688A, 1994 WL 688262, at *1(W.D.N.Y. Oct.28, 1994) ("*Seneca Nation I*") ("statute of limitations... [is] insufficient defense[ ] to claims brought under the [NIA]"); *Cayuga II, supra,* 565 F.Supp. at 1301 (citing cases) ("[I]t has been established ... that defenses based upon state law such as ..., statutes of limitation, ... are unavailable to ... defendants" in NIA actions.) This court is fully cognizant, as the State notes, that the Court in *Oneida IV* was "closely divided[.]" *See* Def. Memo. at 22 (citation omitted). Nonetheless, the court will not disregard established precedent governing this statute of limitations issue. Certainly the State has provided no basis for the court to do so. The State has done nothing more than speculate that perhaps some day, somewhere, a court will limit *Oneida IV*'s statute of limitations rule to tribal plaintiffs having a "trust relationship" with the U.S. Accordingly, because this particular statute of limitations defense clearly is insufficient, the court grants the Tribes' motion to strike paragraph 18 of the State's answers in the Main Land actions.

### b. *42 U.S.C. § 1983*

■ Distinguishing among the 42 U.S.C. § 1983 causes of action and the federal common law and NIA land claims, defendants assert that the court should permit the statute of limitations defense to stand as against the former. In making this argument, the defendants rely upon the settled rule that "federal constitutional claims, brought pursuant to § 1983, are governed by New York's three-year statute of limitations[.]" *See Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001) (citing, *inter alia, Owens v. Okure,* 488

U.S. 235, 240–41, 109 S.Ct. 573, 576–78, 102 L.Ed.2d 594 (1989)). With no analysis, defendants assert that application of that rule to the present case mandates a finding that the statute of limitations is a viable defense to the Tribes' section 1983 causes of action.

■ Nowhere do the Tribes address the statute of limitations defense as it relates to section 1983. Compounding that omission is defendants' failure to consider when a section 1983 cause of action accrues for statute of limitations purposes. "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Connolly,* 254 F.3d at 44 (internal quotation marks and citation omitted). Given that no discovery has yet to be conducted, and the generalized nature of the defendants' pleadings, there is no way to discern when the Tribes knew or "ha[d] reason to know" when the section 1983 causes of action accrued for statute of limitations purposes. That uncertainty directly benefits the Power Authority and indirectly benefits the other defendants because it follows that it would be premature for the court to strike the statute of limitations defense as it pertains to the section 1983 causes of action.[17]

### D. "Delay Based Defenses"

Originally the defendants asserted four delay based defenses: (1) estoppel; (2) adverse possession; (3) mitigation; and (4) lost title. As mentioned earlier, the defendants do not oppose striking adverse possession and lost title, thus leaving estoppel and mitigation for the court's consideration. The arguments as to the viability of the latter two defenses focus on whether they should be construed as based upon state law or federal common law. This federal common law versus state law distinction also is a primary dispute which will be considered hereinafter. For the moment, as do the Tribal plaintiffs herein, the court will confine its analysis to estoppel and mitigation.

### 1. Estoppel

■ The State alleges that "[t]he *claims* are barred by the *federal common law* doctrine of equitable *or other estoppel.*"[18] St. An. (82–CV–783) at 12, ¶ 13; and St. An. (89–CV–829) at 10, ¶ 13 (emphasis added). The Power Authority does not differentiate between federal common law and state law instead asserting that "[t]he *claims* are *barred,* in *whole or in part,* by equitable estoppel." Power Auth. An. (82–CV–1114) at ¶ 12; and Power Auth. An. (82–CV–1114) at ¶ 15 (emphasis added). Given that in land claim actions courts have uniformly held that equitable estoppel is a state delay based defense, presumably the Power Authority is also taking that position, especially due to the lack of any suggestion to the contrary in either of its answers.

---

17. The other defendants also assert statute of limitations defenses directed at the section 1983 claims, but the Tribes are *not* seeking to strike those other defenses. At first glance, the Tribes' position appears inconsistent. As it turns out however, it is not. There is no inconsistency given the court's refusal to strike the statute of limitations as a defense to the Tribes' section 1983 claims. Obviously, that ruling applies with equal force to the Municipal and the State defendants' affirmative defenses asserting that the Tribes section 1983 claims are time barred.

18. The State does not specify what it intends by the phrase, "or other estoppel." Judicial estoppel is one obvious choice, but because that type of estoppel is not mentioned anywhere by the State, the court will limit its discussion to equitable estoppel.

Relying upon a line of cases beginning with *Oneida Indian Nation v. County of Oneida*, 434 F.Supp. 527, 541–44 (N.D.N.Y.1977) ("*Oneida II* "), and including the Second Circuit's decision in the *Pre–NIA Oneida* case, *supra* 691 F.2d 1070, the Tribes assert that as a "state delay-based defense[,]" estoppel should be stricken as an affirmative defense herein. *See* Tr. Memo. at 7. Defendants do not dispute the Tribes' contention that estoppel is a state delay based defense. But according to defendants, such defenses are also "grounded in federal common law[,]" and hence it is proper to deny this motion to strike estoppel as an affirmative defense. *See* Def. Memo. at 23 (footnote omitted). In what is by now a familiar refrain, defendants further contend that estoppel is dependent upon development of a factual record. Impliedly, defendants are suggesting that at a minimum they require discovery, which perhaps will reveal facts necessary to establish equitable estoppel, but they do not specify the nature and breadth of such discovery.

■ According to the Second Circuit, "It is clearly established that a suit by the [U.S.] as trustee on behalf of an Indian tribe ,is not subject to state delay-based defenses." *Pre–NIA Oneida II*, 691 F.2d at 1084 (citing, *inter alia, Board of Commissioners v. United States*, 308 U.S. 343, 350–51, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939)). The Second Circuit offered two reasons for that rule. First, reasoning that "the interest sought to be protected . . . are the same, no matter who the plaintiff may be[,]" the Court found that "[i]t would be anomalous to allow the trustee to sue under more favorable conditions than those afforded the tribes themselves." *Id.* (internal quotation marks and citations omitted). Second, "to permit a state to enact and invoke a time-bar would in effect allow a state to terminate the relationship

of trust and guardianship between the [U.S.] and [tribal entities.]" *Id.* (citation omitted).

This court is keenly aware that the Second Circuit in *Pre–NIA Oneida II*, did not explicitly mention equitable estoppel as a state delay based defense. Courts have uniformly identified estoppel as being a state delay based defense which is not available to defeat an otherwise valid NIA claim, however. *See, e.g., Seneca Nation I, supra,* 1994 WL 688262, at *2, (granting defendants' motion to strike estoppel, among other affirmative defenses, as an "insufficient defense[ ] to Indian land claims[ ]" (citing, *inter alia, Cayuga Indian Nation, supra,* 565 F.Supp. at 1301; *Schaghticoke Tribe of Indians v. Kent School Corp., Inc.,* 423 F.Supp. 780, 784 (D.Conn.1976) (emphasis added) ("The cases make plain" that among other defenses, "*estoppel cannot bar recovery* of Indian lands in a suit brought to recovery protected territory."); and *Narragansett Tribe v. So. R.I. Land Devel.,* 418 F.Supp. 798, 804 (D.R.I.1976) ("No defense of laches *or estoppel* is available to the defendants . . . for the Government as a trustee for the Indian Tribe, is not subject to those defenses.") (internal quotation marks and citations omitted) (emphasis added). In these cases, the availability of estoppel as a defense centered on the issue of liability.

Just last year, however, in *Oneida Reservation* Judge Kahn held that "as a matter of law" estoppel was "unavailable to Defendants, *at least for purposes* of *determining Defendants' liability." Oneida Reservation,* 194 F.Supp.2d at 122 (citation omitted) (emphasis added). Limiting the availability of estoppel as a defense in this way suggests the possibility that estoppel may be available in some way as a defense in terms of any relief to which the Tribal plaintiffs eventually may be entitled. *Oneida Reservation* is ambiguous on that

point though, in that despite what seems like the unequivocal language just quoted, estoppel is NOT among those defenses which Judge Kahn ultimately allowed to "remain for the limited purposes of determining damages." *See id.*

· Nonetheless, in this court's opinion because estoppel *may* become relevant at some later point in this litigation, the court will not strike that defense in its entirety. The court will, however, strike the affirmative defense of estoppel as alleged in the State's answers and the Power Authority's answers, St. An. (82–CV–783) at 12, ¶ 13; St. An. 89–CV–829) at 10, ¶ 13; · Power Auth. An. (82–CV–1114) at ¶ 12; and Power Auth. An. (82–CV–1114) at ¶ 15, insofar as those defenses can be read as a defense to NIA liability. The court will not strike those defenses, at least at this juncture, to the extent the same can be read as asserting a defense to relief under the NIA. By the same token, though, the court will not allow discovery on the issue of estoppel as it relates to liability. Allowing such discovery would be highly prejudicial to the Tribes in that they would be forced to expend resources unnecessarily because, as should be abundantly clear by now, estoppel is simply unavailable as a defense to liability here. *See Seneca Nation I,* 1994 WL 688262, at *2 ("No discovery is warranted because the laches defense is unavailable as matter of law.")

### 2. *Mitigation*

 Again couching this affirmative defense in terms of federal common law, the State alleges that "[t]he *claims* are *barred in whole or in part* by the federal common law of failure to mitigate damages." St. An. (82–CV–783) at 11, ¶ 4; and St. An. (89–CV–829) at 9, ¶ 4 (emphasis added). The Power Authority's mitigation defense is different from that of the State's. Rather than focusing on liability,

the Power Authority asserts that "[p]laintiffs *failed* to *mitigate* any *damages* they may have sustained." Power Auth. An. (82–CV–1114) and (89–CV–829) at ¶ 29 (emphasis added). Thus, in contrast to the State, the Power Authority is not alleging mitigation as a defense to liability, but only as to damages.

In addition to making the same arguments which they did for striking estoppel, *i.e.,* as a state delay-based defense, the Tribes declare that mitigation is "no more than another way of asserting laches." Tr. Memo. at 8. Mitigation "should be stricken" for that reason and because, from the Tribes' standpoint, it is "redundant" as well as being "a legal question that has already been decided" adversely to defendants in terms of laches. *See id.* From the foregoing it might appear that the Tribes are seeking to strike the mitigation defense in its entirety. Closer scrutiny reveals the Tribal plaintiffs awareness of the court's mitigation rulings in *Oneida Reservation. See id.* at 9, n. 6. There, Judge Kahn held that mitigation would "remain [as an affirmative defense] for the *limited purpose* of determining *damages* [,]" even though mitigation was "*not* relevant to Defendants' liability." *Oneida Reservation,* 194 F.Supp.2d at 122–23 (emphasis added). The court thus construes the Tribal plaintiffs' argument as seeking to strike mitigation as an affirmative defense in terms of liability only.

The role of mitigation in this lawsuit need not detain the court for long. The court agrees with Judge Kahn that mitigation has no place in determining liability, but it may become relevant at some point with respect to damages. Thus, the court grants the Tribes' motion to strike the State's mitigation defense insofar as it can be read as pertaining to liability. That defense will remain, however, for damage purposes. On the other hand the court

denies the defendants' motion to strike the Power Authority's mitigation defense because, as alleged, the Power Authority has limited the application of that defense to damages.

### E. Non–Delay "State Law" Based Defenses [19]

■ As they did in the previous section, the Tribes vigorously contend that the defenses of accord and satisfaction, unclean hands and waiver are *state law* based. Thus, the Tribes argue that those defenses must be struck here where the Tribes are seeking to enforce their rights to land under federal law. Conversely, the State alleges that each of those three defenses is based upon *"federal common law* [,]" and consequently bars the Tribes' claims. *See* St. An. (82–CV–783 & 89–CV–829) at ¶¶ 15–17 (emphasis added). Of the three defenses just listed, the Power Authority asserts only waiver. *See* Power Auth. An. (82–CV–1114) at ¶ 23; Power Auth. An. (89–CV–829) at ¶ 26. In any event, again there is a disagreement as to whether the three defenses set forth above are based upon state law or federal common law.

Regardless of their derivation, the court will consider the following defenses together: (1) accord and satisfaction; (2) unclean hands; and (3) waiver. Starting from the premise that these defenses are state law

based, the Tribes maintain that such defenses are unavailable because " 'state statutes cannot supersede federally created rights.' " Tr. Memo. at 9 (quoting *Narragansett Tribe,* 418 F.Supp. at 804) (other citations omitted). As further support for the proposition that state law defenses are irrelevant to Indian land claims, the Tribes observe that in *Oneida IV,* the Supreme Court held that "borrowing of a state limitations period in these cases would be inconsistent with federal policy." *See Oneida IV,* 470 U.S. at 241, 105 S.Ct. at 1255. Applying that reasoning to the three state law defenses identified above would be inconsistent with federal policy. Therefore, the Tribes contend that the court should grant their motion to strike these defenses.

Defendants retort that the Tribes are "mischaracteriz[ing] the defenses of waiver, unclean hands and accord and satisfaction[,]" because "[t]here is *considerable* authority that these defenses arise under *federal common law.*" Def. Memo. at 28 (emphasis added).[20] The defendants are ignoring a critical distinction between those three cases, however, and the present one. Each of the cases cited in footnote 20 implicated very different interests than those which this land claim implicates. Obviously, none of the cases upon which defendants are relying involved a question as to "Indian title [in land] as a

---

19. Lack of notice had been included in this group, but as noted at the outset, that it is no longer an issue.

20. *See Manning v. Hayes,* 212 F.3d 866, 874 (5th Cir.2000) ("applying federal common law to disputes between a non-beneficiary claimant and the named ERISA beneficiary to life insurance proceeds"), *cert. denied,* 532 U.S. 941, 121 S.Ct. 1401, 149 L.Ed.2d 345 (2001); *Local Union No.1992, Int'l. Broth. of Elec. Workers v. Okonite Co.,* 189 F.3d 339, 348–49 (3rd Cir.1999) ("Federal common law governs whether the employees who signed

the release validly waived their rights to sue under the [Worker Adjustment and Retraining Notification Act], a federal statute."); and *Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of America (UAW) v. Yard–Man, Inc.,* 716 F.2d 1476, 1487 (6th Cir.1983) (lawsuit brought under National Labor Relations Act to interpret collective bargaining agreement court applied accord and satisfaction because the principles of that defense were "well established in both … general common law and law of [state] where … contract originate[d]").

result of the federal government's 'unique obligation toward the Indians[.]' " *See Narragansett Tribe,* 418 F.Supp. at 804 (quoting *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). And, as the Supreme Court has stressed, it is that "unique" trust relationship, along with "the same federal policy of protecting the Indians and their rights to their land" which renders state law-based defenses inapplicable in this setting. *See Sherrill,* 145 F.Supp.2d at 260 (citation omitted). To allow such affirmative defenses in Indian land claim actions would eviscerate the Tribes' interest in reclaiming their homeland, or in some way being recompensed for the alleged deprivation of that land. *See Oneida Reservation,* 194 F.Supp.2d at 126. In short, none of the three cases compel the conclusion, as defendants urge, that traditional state law defenses such as accord and satisfaction, unclean hands, and waiver have any bearing upon this land claim action. Having found that the defendants' "delay-based defenses" are state law based, the court will next consider whether any of these defenses can withstand the Tribes' motion to strike.

### 1. Accord & Satisfaction

■ Extending the Supreme Court's rationale in *Oneida IV* to the "state law-based defense[ ] of accord and satisfaction[,]" the *Seneca Nation I* court held that that defense was "clearly insufficient as a matter of law" because its "application ... would contravene established policy pertaining to Indian's ability to enforce their property rights." *Seneca Nation I,* 1994 WL 688262, at *1—*2 (quoting *Oneida IV,* 470 U.S. at 241, 105 S.Ct. at 1255). This court agrees: accord and satisfaction is not a defense to this land claim action.

### 2. Unclean Hands

■ Relying upon that same federal policy of protecting Indians and their land

rights, in *Seneca Nation I* the court also held that the affirmative defense of unclean hands was "clearly insufficient as a matter of law[;]" and hence it granted the Tribe's motion to strike that defense as well. *Id.* (internal quotation marks and citation omitted). As with accord and satisfaction, the court adopts the reasoning in *Seneca Nation I,* and thus grants the Tribes' motion to strike this particular affirmative defense.

### 3. Waiver

■ Waiver was also a legally insufficient defense to the NIA claims alleged in *Seneca Nation of Indians.* The court there did not provide its reasons for striking waiver, except to cite to three other land claim cases. In only one of those cases, however, was the waiver issue actually before the court. *See Schaghticoke Tribe v. Kent School Corp.,* 423 F.Supp. 780, 783–85 (D.Conn.1976) ("[r]elying on the strong policy in favor of vindication of ... Indian claims," the court held, *inter alia,* that waiver under Connecticut state law could "no more bar recovery" by the Tribe than if such defense was alleged against the U.S.). For substantially the same policy reasons, Judge Kahn also granted the Tribes' motion to strike waiver as an affirmative defense. *See Oneida Reservation,* 194 F.Supp.2d at 126.

In a slightly different context, the district court in *Sherrill* held that it would be futile to allow the defendant city to amend its answer to include waiver as a defense in a claim by "Indians relating to their rights to [have] their land [be] free from taxation." *Sherrill,* 145 F.Supp.2d at 260. In *Sherrill* the district court relied upon the "same federal policy of protecting the Indians and their right to their land that precludes defense of laches[.]" *Id.* (citing *Seneca Nation I,* 1994 WL 688262, at *2).

The court sees no reason, and the defendants offer none, to deviate from the line of cases discussed herein. Accordingly, the court grants the Tribes' motion to strike the affirmative defenses of accord and satisfaction, unclean hands and waiver.

### F. "Non–Federal Ratification" Defenses

Next the Tribes are seeking to strike the affirmative defenses of (1) abandonment; (2) release and relinquishment; [21] and (3) "State Title." In addition to addressing these three defenses in this section, the court will also address what the Tribes refer to as the "Defense Based on the [1838] Treaty of Buffalo Creek[.]" *See* Tr. Memo. at i. Although not part of the Tribes' grouping of defenses, because there is a close relationship between the defenses based upon that 1838 Treaty and the release defense, it is logical to address them together.

### 1. Abandonment

■■■■■ Abandonment, like many of the issues herein, is not unfamiliar to this court. In deciding whether the tribal plaintiffs had abandoned their homeland so as to preclude recovery, this court in *Cayuga Indian Nation of New York v. Cuomo,* 758 F.Supp. 107 (N.D.N.Y.1991) ("*Cayuga IV*"), distinguished between aboriginal and recognized title. " '[A]boriginal title' connotes rights deriving from ancestral use." *See Alabama–Coushatta Tribe of Texas v. United States,* 28 Fed. Cl. 95, 108 (Fed.Cl. 1993) (citing *United States v. Santa Fe R.R.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941)). Thus, "[a]n Indian tribe obtains *aboriginal title* in land when it *continually uses and occupies* said property to the exclusion of other Indian tribes or persons." *Cayuga IV,* 758 F.Supp. at 110 (emphasis added). On the other hand,

"[w]here Congress has, by treaty or statute conferred upon the Indians the right to permanently occupy and use land, then the Indians have a right or title to that land which has variously been referred to ... as 'treaty title', 'reservation title', 'recognized title', and 'acknowledged title.' " *Miami Tribe of Oklahoma v. United States,* 146 Ct.Cl. 421, 175 F.Supp. 926, 936 (1959). "[T]here exists no one particular form for such Congressional recognition or acknowledgment of a tribe's right to occupy permanently land and that right may be established in a variety of ways." *Id.* (citing, *inter alia, Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955)). Drawing a distinction between "[t]reaty-reserved rights ... and aboriginal rights" is necessary because, there are "different levels of legal protection[,]" depending upon the nature of the right held by the Indians. *See Menominee Indian Tribe of Wisconsin v. Thompson,* 161 F.3d 449, 456 (7th Cir. 1998) (citing, *inter alia, Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 338–39, 65 S.Ct. 690, 89 L.Ed. 985 (1945)).

Relying upon those two different types of title, in *Cayuga IV* this court explained that when a tribe has *aboriginal* title to land, "proof of a tribe's *voluntary abandonment* of [the] property constitutes a *defense* to a subsequent claim concerning the land." *Cayuga IV,* 758 F.Supp. at 110 (emphasis added) (footnote omitted) (citing F. Cohen, Handbook of Federal Indian Law (1982 ed.) at 492 and cases cited therein). On the other hand, "if an Indian tribe possesses *recognized* title in certain land, then Congress, and *only Congress,* may *divest* the *tribe* of its *title* to such land." *Id.* (emphasis added) (citing cases). After scrutinizing the 1794 Treaty of Can-

---

**21.** For brevity's sake, throughout this section this defense will be referred to as "release."

andaigua and the relevant case law, in *Cayuga IV* this court found that that Treaty conferred reserved or recognized title upon the Cayuga. Thus, the Cayugas' subsequent "physical abandonment of the property ... [was] irrelevant" to their "claim for land based upon reserved title[.]" *Id.* at 118. On that basis, the court granted the Cayugas' motion for partial summary judgment "holding that the defendants' affirmative defense [of] ... abandonment [was] insufficient as a matter of law to preclude recovery on plaintiffs' claims." *Id.* at 109.

■ Although there are several purported treaties at issue in this action, the Tribes are only seeking to strike the abandonment defense as to the first, second and third claims relating to the 1796 Treaty. *See* Tr. Memo. at 10. Two parts of that Treaty are germane here. First that Treaty provides:

> That the tract equal to six miles square, *reserved* in the sale made by the commissioners of the land-office of the said state, to Alexander Macomb, to be applied to the *use* of the *Indians* of the village of *St. Regis, shall still remain so reserved.*

Co. (89–CV–829), Attachment B thereto (1796 Treaty) (emphasis added). The 1796 Treaty further provides:

> That there *shall* be *reserved,* to be applied to the use of the Indians of the said village of St. Regis, in like manner as the said tract is to *remain reserved,* a tract of one mile square, at each of the said mills, and the meadows on both sides of the said Grass river from the said mill thereon, to its confluence with the river St. Lawrence.

*Id.* (emphasis added). Focusing on the use of the word "reserved," the Tribes maintain that under the plain language of that Treaty, they received recognized or reserved title. *See* Tr. Memo. at 10.

Then, although unexpressed, evidently the Tribes are taking the position that because nothing in this record shows that Congress divested the Tribes of their title obtained under that 1796 Treaty, abandonment is *not* a bar to the Tribes' claims thereunder. *See id.* at 10–11.

Defendants interpret the 1796 Treaty differently than do the Tribes. As defendants read it, the 1796 Treaty did *not* confer recognized or reserved title upon the Tribes because it did "not reflect any firm intention to grant [them] permanent rights[,]" such as by using the words "reservation" or "property[.]" Def. Memo. at 30 and 32 (internal quotation marks and citation omitted). Instead, construing the Treaty more narrowly, the defendants interpret it as "merely maintain[ing] the *status quo* " in terms of the Macomb purchase mentioned in part of the 1796 Treaty quoted above. *See id.* at 30. Implicit in that interpretation is that the Tribes had aboriginal title in the subject property, and hence abandonment is a viable defense. Shifting gears, the defendants argue that "at most" the 1796 Treaty conferred "rights of use or occupancy[ ]" upon the Tribes—rights which defendants declare "can be extinguished by voluntary abandonment." *Id.* at 32 (citations omitted). What is more, according to the defendants, voluntary abandonment can occur *regardless* of the nature of the title held by these Tribes. Rather than focusing upon title, the defendants maintain that the issue is whether a tribe has a mere right of occupancy *or* fee title. Under this theory, the defendants postulate that even if the 1796 Treaty bestowed recognized title upon the Tribes, abandonment is still a viable defense. That is exactly what happened here defendants suggest; the Tribes voluntarily left the subject land and thus are deemed to have abandoned it. Based upon that reasoning, the defendants maintain

that the court has no choice but to deny the Tribes' motion insofar as it is seeking to strike abandonment as a defense. The court agrees that it is appropriate to deny the Tribes' motion to strike this defense to the 1796 Treaty claims, but not for the reasons defendants are advancing. The court gives little if any credence to the premise that the nature of a tribe's title is irrelevant to the defense of abandonment. Clearly that proposition directly conflicts with *Cayuga IV*, wherein this court found that it was *"critical"* to distinguish between the "two distinct types of title to Indian land[,]" to decide whether defendants' abandonment defense was insufficient as a matter of law. *See Cayuga IV*, 758 F.Supp. at 109–10 (emphasis added).

This court is not alone in relying upon the difference in the nature of the title held by Indians to decide whether abandonment is a viable defense in a land claim action. When faced with a motion to strike that defense in *Oneida Indian Nation*, Judge Kahn stressed that "[t]he question that must be resolved in order to determine the validity of [this] defense is whether the Oneida Nation possessed aboriginal rights over the land at issue or whether it possessed actual fee title to the land." [22] *See Oneida Reservation*, 194 F.Supp.2d at 127. Judge Kahn was not able to resolve that issue on a motion to strike though. Unlike *Cayuga IV*, where the record on cross-motions for summary judgment was sufficiently developed to support a finding that the treaty at issue conferred recognized title, in *Oneida Reservation* the court denied the plaintiffs' motion to strike observing that the title issue could not be resolved without "further discovery and a thorough statutory and treaty interpretation." *See Oneida Reservation*, 194 F.Supp.2d at 127.

The court declined "to rely on the legal and factual determinations of the test case and other Indian cases" because "different land transactions" were at issue in *Oneida Reservation. Id.* (citations omitted). The court in *Oneida Reservation* also declined to rely upon those other cases which "interpret[ed] ... the relevant treaties as they appl[ied] to the Oneida Nation specifically[,]" as opposed to the Wisconsin Oneida and the Thames Oneida, the two Tribal entities which allegedly abandoned the land at issue therein. *Id.* (citations omitted); *accord United States v. Alaska*, 197 F.Supp. 834, 839 (D.Alaska 1961) (in quiet title action fact issues created by conflicting affidavits as to Indians' occupation of tidelands and whether they abandoned same could not be decided on summary judgment motion).

A careful review of the parties' respective factual and legal arguments in this case convinces the court that as in *Oneida Reservation*, it would be premature to strike the abandonment defense at this juncture. As this court has previously recognized, interpretation of treaty language "is a question of law for a court to decide." *Cayuga IV*, 758 F.Supp. at 111 (citations omitted). The court cannot resolve that legal issue though without first having an adequately developed factual record, which plainly is missing on this motion to strike. Furthermore although the parties, especially the defendants, devoted a relatively significant part of their argument to comparing the 1796 Treaty language with language from other treaties, the court concurs with Judge Kahn's comment in *Oneida Reservation* that such an exercise is not particularly useful.

---

**22.** Although Judge Kahn referred to "fee title," given his preceding outline of *Cayuga IV* wherein this court explicitly distinguished between aboriginal and recognized title, his reference to fee title was clearly intended to mean recognized title.

As in *Oneida Reservation,* comparing treaty language does not resolve the title issue for several reasons, not the least of which is the inadequacy of the factual record on that issue. Additionally, none of the treaties upon which these defendants are relying involved, even remotely, the land at issue in the present action. Indeed, the treaties from which defendants selectively quote range from the Treaty with the Cherokee, Oct. 2, 1798, 7 Stat. 62 to the Treaty of Feb. 19, 1867, which created the Lake Traverse Indian Reservation in South Dakota. Similarly, none of the various treaties to which the defendants refer pertain in any way to these three Tribal plaintiffs. Accordingly, the court denies the Tribes' motion to strike the abandonment defense as alleged (1) in the State's 8th affirmative defense in both Main Land Actions and (2) as alleged by the Power Authority in its 4th affirmative defense in Main Land II.[23]

### 2. *Release & Relinquishment*

■ As their eighteenth affirmative defense the Municipal defendants allege as follows:

> The mainland conveyances between Plaintiffs and the State ... between 1816 and 1845, about which Plaintiffs complain in the instant action, were valid conveyances.

> Through the 1816–1845 conveyances, Plaintiffs sold and conveyed any and all interests Plaintiffs may have had in the lands conveyed.

Plaintiffs, therefore, *release and relinquished* all claims to the mainlands that are the subject of the instant claim.

Munic. Def. An. (82–CV–783) at 17–18, ¶¶ 87–89 and Munic. Def. An. (89–CV–729) at 20, ¶¶ 96–98 (emphasis added). The State's release allegations are more general, alleging that the Tribes' claims "are barred or substantially mitigated by the defenses of release and relinquishment." St. An. (82–CV–783 & 89–CV–829) at 9, ¶ 9. The Power Authority makes nearly identical allegations: "Plaintiffs' claims are barred, in whole or in part, because they have been ... released ... [.]" *See* Power Auth. An. (89–CV–829) at ¶ 26; and Power Auth. An. (82–CV–1114) at ¶ 23.

The Tribes are seeking to strike these release defenses.[24] Again assuming they have recognized title, the Tribes baldly assert that such title "cannot [be] *independently* release[d] or relinquish[ed][,]," *i.e.* without Congressional action. Tr. Memo. at 11 (emphasis added). Furthermore, defendants do not "indicate[ ] who released or relinquished the title or how the same might have been accomplished." *Id.* (footnote omitted). Thus the Tribes reason this release defense is "conclusory and unavailing as a matter of law[,]" and hence should be stricken. *See id.*

In response, the defendants clarify that the 1838 Treaty of Buffalo Creek is the basis for their release defense. That Treaty provided, *inter alia,* that "several tribes of New York Indians "cede[d] and

---

**23.** Even though the Tribes profess to be seeking to strike abandonment as alleged by the Power Authority in the two Main Land actions (82–CV–783 and 89–CV–829), *see* Tr. Memo. at 9, the Power Authority is *not* a defendant in the former action. Obviously then, that particular aspect of the Tribes' motion is a nullity.

**24.** Specifically *excluded* from this aspect of the Tribes' motion are the separate release defenses relating to the 1797 document[,]" *see* Tr. Memo. at 11, n. 7, more formally known as "the [U.S.] Relinquishment Treaty of 1797 with the Mohawk Nations of Indians (7 Stat. 61)." St. An. (82–CV–783 & 89–CV–829) at ¶ 10; *see also* Power Auth. An. (82–CV–1114) at ¶ 20; and Power Auth. An. (89–CV–829) at ¶ 23.

relinquish[ed] to the [U.S.] all their right, title and interest to the lands secured to them at Green Bay by the Menomonie Treaty of 1831[.]" Def.App. F ("Treaty with the New York Indians, as amended by the Senate of the United States, June 11th, 1838") at 551, Art. 1. "In consideration of the [foregoing] cession and relinquishment[,]" under that Treaty the U.S. "agree[d] to set apart" land situated directly west of ... Missouri, as a permanent home for all the New York Indians[.]" *Id* at Art. 2. By "accept[ing] government lands elsewhere[ ]" and in accordance with the 1838 Treaty, defendants posit that the Tribes "surrendered, released and relinquished their rights to land in New York." Def. Memo. at 36. Put another way, "creation and acceptance" of land outside of New York is the equivalent of release and relinquishment of rights to land within New York, at least from the defendants' standpoint. Defendants therefore urge this court to deny the Tribes' motion to strike release as a defense.

The Tribes retort that the defendants' argument that the St. Regis "released and relinquished their rights to New York land pursuant to the Treaty of Buffalo Creek ... has been rejected by each court to have considered it in the context of a New York land claim." Tr. Reply at 12 (citations omitted). To support that broad assertion, the Tribes cite to *Cayuga Indian Nation of New York v. Cuomo*, 730 F.Supp. 485 (N.D.N.Y.1990) ("*Cayuga III*"), and Judge Port's decision in *Oneida II, supra*, 434 F.Supp. 527. Those cases are completely inapposite, however, because although the courts were examining the Buffalo Creek Treaty, they were doing so in terms of whether its ratification effectively ratified earlier treaties. *See Cayuga III*, 730 F.Supp. at 492 (1838 Buffalo Creek Treaty did not explicitly ratify 1795 and 1807 land conveyances between the State and the Cayuga); and *Oneida II*, 434

F.Supp. at 539–40 (internal quotation marks, citation and footnote omitted) (1838 Treaty did not explicitly recognize or imply ratification of State's 1795 purchase of 100,000 acres of Oneida Reservation). Given that ratification is not an issue on this motion, *Cayuga III* and the *Oneida II* case do not further the Tribes' position that release should be stricken as a defense here.

Perhaps there is some merit, however, to the Tribes' contention that because the 1838 Treaty did not obligate the St. Regis to remove, they cannot be deemed to have relinquished any rights they may have had in the subject property. To support this argument the Tribes emphasize that under the "supplementary terms" of the 1838 Treaty "the [U.S.] Government" plainly agreed "*not* [to] *compel* [the St. Regis to remove[ ]" to the land outside the State. *See* Tr. Reply at 10; and Def.App. F ("Supplementary article to the treaty concluded at Buffalo Creek in the State of New York, dated January 15, 1838[ ]") at 561 (emphasis added). Even in the face of that unequivocal language, heavily relying upon the Supreme Court's decision in *Santa Fe Pacific, supra*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260, defendants insist that release is a viable defense. Defendants are failing to take into account, however, that although the *Santa Fe Pacific* Court found "voluntary relinquishment[,]" it did so in the context of "*aboriginal* land." Tr. Reply at 13 (citing *Santa Fe Pacific*, 314 U.S. at 357–58, 62 S.Ct. 248) (emphasis added). Therefore, *Santa Fe Pacific* at least raises the possibility that voluntary relinquishment turns upon the nature of the title held by the Tribal plaintiffs.

Assuming for the moment that the nature of the title is dispositive as to the release and relinquishment defense, for the same reasons set forth above as to abandonment, the court denies the Tribes'

motion to strike release as a defense. *See Oneida Reservation*, 194 F.Supp.2d at 127 (using the same reasoning, on a motion to strike, court allowed defenses of abandonment, and release and relinquishment to stand). Denial is proper because the record is factually incomplete, indeed practically non-existent. The lack of an adequate record precludes a thorough analysis of the facts and circumstances surrounding the challenged land transactions, and greatly hinders an examination of the relevant statutes and treaties.

### a. "Defense Based on the Treaty of Buffalo Creek"

The Power Authority as its 12th affirmative defense in Main Land II and the Island actions alleges as follows: "Plaintiffs ceded, *released and relinquished* their claims to any land in New York State pursuant to the 1832 Menominee Treaty and the 1838 Buffalo Creek Treaty (7 Stat. 550)." Power Auth. An. (89–CV–829) at ¶ 24; and Power Auth. An. (82–CV–1114) at ¶ 21 (emphasis added). The Municipal defendants in both Main Land actions make similar allegations, except they provide far more detail than the Power Authority. *See* Munic. Def. An. (82–CV–783) at 19–21, ¶¶ 96–101; and Munic. Def. An. (89–CV–829) at 24–26, ¶¶ 110–115. Unlike the Power Authority, besides reasserting release as a defense, the Municipal defendants are claiming that by the 1832 and 1838 Treaties "the [U.S.] *ratified* the removal and relocation of the St. Regis Indians from the State of New York." *Id.* at 21, ¶ 100; and *Id.* at 26, ¶ 114 (emphasis added).

As they did with respect to release, the Tribes contend that the so called Buffalo Creek defense has already been rejected in *Cayuga IV* and in Judge Port's decision in the *Oneida Test* case. And again, the Tribes are quoting from the supplemental article to the 1838 Treaty that the federal government would "not compel them to remove[ ]" to support their contention that the Buffalo Creek defense cannot survive this motion to strike. *See* Def.App. G at 512–13. This supplemental article, according to the Tribes, "preserved [their] rights" to the subject property. *See* Tr. Memo. at 15. Then, as with so many of the defenses which they are seeking to strike, the Tribes return to the underlying theme that there is "no set of facts or law" to support defendants' position and pursuit of this defense "will . . . lead to delay and substantial useless discovery." *Id.* at 16. The defendants did not respond to these arguments at all.

The Tribes' argument gains little by repetition, especially insofar as they are contending that this Buffalo Creek defense should be stricken because it is insufficient as a matter of law to establish release and relinquishment. By the same token, the Tribes' argument that this defense has no merit based upon prior case law, *i.e. Cayuga III* and the *Oneida II*, *supra*, 434 F.Supp. 527, is persuasive to a certain degree. More specifically, insofar as the Buffalo Creek defense is premised upon the U.S.' government purported "ratifi[cation] [of] the removal and relocation of the St. Regis Indians from . . . New York[,]" as mentioned earlier, a similar ratification argument was rejected in both *Cayuga III* and *Oneida II*. Accordingly, to the extent this particular defense is based upon ratification, the court strikes the same. However, because the remainder of this defense is encompassed within the defendants' more generic release defense, for the reasons set forth above, the court denies this motion to strike.

### 3. "State Title"

This defense is based on the State's assertion that any interest which the

Tribes had in the land which was the subject of the 1796 Treaty was "lawfully extinguished" by that Treaty, thus granting the State "full title to such lands." St. An. (82–CV–783) at 14, ¶ 27; St. An. (89–CV–829) at 12, ¶ 30. Any interest which the Tribes may have acquired under that Treaty, the State alleges, "was a right of use only[.]" *Id.* at 14, ¶ 28; *Id.* at St. An. (89–CV–829) at 13, ¶ 31. Based upon those premises, the State goes on to aver that federal law, whether in the form of the NIA or "earlier federal treaties," does not "apply" to the Tribes' interest in the subject land. *Id.* at 14, ¶ 27; and *id.* at 12–13, ¶ 30. Taking that argument one step farther, because federal law is inapplicable, the State avers that the transactions challenged in this litigation are "valid."

Couching this defense in slightly different terms, the Municipal defendants claim that the Tribes "ha[ve] no *aboriginal claim* "[25] to the lands "reserved" for their "use" under the 1796 Treaty. Mun. Def. An. (82–CV–783) at 17, ¶ 83 (emphasis added). The Municipal defendants further allege that at all relevant times, "the State ... held title to" the subject lands. *See id.* at ¶ 85. For these reasons, in an argument akin to the State's argument, as part of its seventh affirmative defense the Municipal defendants assert that the Tribes "can not make out a *prima facie* claim under the [NIA]." *Id.* at ¶ 86.

Characterizing the foregoing as a "State Title" defense, as the Tribes read it the State is "claiming that its title is superior to the authority of the [U.S.] over Indian lands." Tr. Memo. at 11. Disagreeing with this "State Title" characterization, defendants counter that they are actually alleging that the Tribes "lack aboriginal title" to the disputed land. *See* Def.

Memo. at 40. According to the defendants, that lack of aboriginal title is due to a contract between the State and a private party, Alexander McComb, to which the Tribes "were merely third-party beneficiaries[.]" *Id.* The court observes that nowhere in the defendants' so-called "State Title" affirmative defenses is there any mention of this alleged contract.

In any event, following the parties' lead, the court will give only cursory treatment to this rather unique defense. Although not the model of clarity, the court construes this "State Title" defense in basically the same manner as do the Tribes. Evidently the State believes that based upon its title to the subject land, the State could "validly extinguish the interest" which the Tribes acquired in that land through the 1796 Treaty. That theory directly conflicts with the "rudimentary proposition[ ] that Indian title is a matter of federal law and can be extinguished only with federal consent[.]" *See Oneida Indian Nation of New York v. Oneida County,* 414 U.S. 661, 669–70, 94 S.Ct., 772, 778, 39 L.Ed.2d 73 (1974) (*"Oneida I "*). What is more, the Supreme Court in *Oneida I* explicitly found that "rudimentary proposition" to apply to states, such as New York, where "fee title to Indian lands ..., or the pre-emptive right to purchase form the Indians, was in the State" as opposed to the U.S. *Id.,* 94 S.Ct. at 778–79, 94 S.Ct. 772 (citation and footnote omitted). Accordingly, this court finds that the "State Title" defense is insufficient as a matter of law, and thus grants the Tribes' motion to strike same.

### G. Exhaustion of Remedies

In the State's answers only, it alleges that "[t]he claims are barred for failure to

---

**25.** Despite their choice of the word "claim," the court construes this allegation as referring to aboriginal title.

exhaust available remedies under the treaties, agreements, instruments, letters patent, and other documents upon which Plaintiffs rely." None of the other defendants are raising this defense. The Tribes accurately note that the State has not alleged "any facts [to] support this defense and it is unclear how it applies" here. Tr. Memo. at 12. Evidently the State realizes those defects as there is no mention, let alone discussion, of this defense in the defendants' opposition memorandum. Thus, agreeing with the Tribes that this defense is "conclusory . . . , and is not supported by the facts alleged in the answer[,]" the court grants their motion to strike same. *See id.*

### H. Indispensable Party

■■■ The State alleges that the Iroquois Confederacy is an indispensable party which must be joined or this action dismissed. *See* St. An. (82–CV–783) at 15, ¶ 34; and St. An. (89–CV–829), at 14, ¶ 37. Closely tracking the language of Rule 19(a),[26] the State alleges as follows. "[*U*]*pon information and belief,*" the Confederacy "claims an interest in the subject lands sought by the [Tribes]." *Id.* (emphasis added). Without joinder, the Confederacy's "ability to protect [its] claimed interest in the subject lands . . . may [be] impair[ed] or impede[d][.]" *Id.* In addition, without joinder the State alleges that it would be at a "substantial risk of multiple legal claims or otherwise inconsistent obligations" due to the Confederacy's purported interest in the subject property. *Id.* Similarly, the Municipal defendants basically allege that as a "signator[y]" to the "1768 Treaty of Fort Stanwix," the "1784 Treaty of Fort Stanwix" and the "1794 Treaty of Canandaigua,"[27] the Iroquois Confederacy should be named as a plaintiff herein. *See* Mun. Def. An. (89–CV–829) at 16, ¶ 79. For the sake of argument, the court is assuming, as the parties seem to be doing, that the Confederacy is a "person" within the meaning of Rule 19(a).

The Tribes offer two reasons as to why the court should strike the indispensable party defense; it has no basis in law *or* fact. From a legal standpoint, the Tribe contends that the defendants lack standing to assert that the Confederacy is an indispensable party plaintiff. Next, primarily based upon the declaration of attorney Joseph Heath, the Tribes contend that there is no factual support for this defense. Defendants are taking the opposite view: "factual and legal questions" preclude granting the Tribe's motion to strike as to this particular defense. *See* Def. Memo. at 41.

The standing issue warrants little discussion. The defendants maintain that because they can satisfy the elements of Rule 19(a), they have standing to assert that the Confederacy is an indispensable party to this litigation. As the following discussion makes clear, however, the elements of Rule 19(a) are *not* met here. Thus, the

---

26. Rule 19 states in relevant part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

27. The latter two treaties, along with the 1796 Treaty, at this point seem to be the main treaties at issue.

defendants lack standing to assert a Rule 19 based affirmative defense.

"Rule 19 requires the court to conduct a two-part analysis in order to determine whether an absent party is necessary and indispensable." *Seneca Nation of Indians v. New York*, 213 F.R.D. 131, 137 (W.D.N.Y.2003). Rule 19(a) provides that "[a]n absent party is necessary and shall be joined" if certain criteria thereunder are met. *Id.* If the court finds that a non-party is necessary under subsection (a), then it must consider whether that non-party is indispensable under Rule 19(b). *See id.* There is no need to address the indispensability factor though unless "Rule 19(a)'s threshold standard is met[.]" *See id.* (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir.1990)). Thus, the court will first examine that "threshold standard" vis-a-vis the Iroquois Confederacy. *See id.*

Pursuant to Rule 19(a), among other things the court must "determine whether the absent part[y] in fact claim[s] an interest relating to the subject of this action." *See Oneida Reservation*, 194 F.Supp.2d at 114. Given the striking similarities between *Oneida Reservation* and the present case (at least as to this issue), Judge Kahn's reasoning therein is especially instructive here.

There, as here, the defendants were claiming that among other tribal entities the Iroquois Confederacy was a necessary party to that land claim action. Also as in the present case, in *Oneida Reservation* responding to the defendants' Rule 19 mo-

tion, the Confederacy "submitted an affidavit . . ., specifically indicating that it has no objections to this case going forward in its absence." *Id.* at 116 (citation omitted). "While th[at] affidavit d[id] not specifically state that the Confederacy has no interest in th[a]t action," nonetheless the court found "persuasive . . . the Confederacy's lack of objection" to that action going forth in its absence. *Id.*

Another factor which weighed in the court's analysis was that "[s]everal Indian land claim[s] involving the constituent tribes of the Confederacy have proceeded in the federal courts *without* the Confederacy." *Id.* (emphasis added) (citing, *inter alia, Cayuga and* the present case). Furthermore, as the court astutely observed, "[n]either the courts nor the Confederacy itself have ever suggested that the Confederacy's presence was necessary in those actions." *Id.* Nor has the Confederacy "attempted to intervene in any of these actions in order to assert the purported interest that Defendants ascribe to it." *Id.* Those factors, as well as the fact that "[t]here [were no competing claims to the land among the other constituent nations of the Confederacy[,]" weighed heavily in the court's finding that the Confederacy "claim[ed] no real interest in th[at] action[,]" and hence it was not a necessary party under Rule 19." *Id.* at 116, n. 5; and 116.

Likewise, in the present case the Iroquois Confederacy has submitted an affidavit,[28] while not explicit on this point, can

---

28. To the extent the defendants are contending that the court should not consider the Heath declaration because it is "hearsay," *see* Def. Memo. at 43, n. 23, the court rejects that contention. In *Oneida Indian Nation of New York v. Madison County*, 145 F.Supp.2d 268 (N.D.N.Y.2001), the plaintiff tribe sought to prevent the defendant County from assessing property tax on land within the County and owned by the tribe. Pursuant to Rule 19, the County moved to dismiss for failure to join necessary parties, the Wisconsin and Oneida Thames, two other tribes who claimed ownership in the property. Those two tribes submitted declarations that they decided not to join in that action and that "they believe[d] their interests w[ould] not be prejudiced by their absence from th[e] action." *Id.* at 270.

be read as asserting that it is not claiming an interest in the subject matter of this action. More specifically, attorney Heath, "general counsel to the Onondaga Nation, the central nation of the [Iroquois Confederacy] ... and *special counsel to the [Confederacy] in this action* [,]" avers that the Confederacy "has *no objection to* [*this lawsuit*] *going forward*" in its absence. Walker Affirm., exh. B thereto (Declaration of Joseph Heath, Esq. (May 24, 2002) at 2, ¶¶ 2 and 3)) ("Heath Decln") (emphasis added). Moreover, the fact that the defendants, as opposed to the Confederacy as the absent party, are claiming an interest for Rule 19(a)(2) purposes, further undermines the defendants' necessary party argument. *See ConnTech Development Co. v. University of Conn.,* 102 F.3d 677, 683 (2d Cir.1996) (citation omitted) (Defendant's "self-serving attempts to assert interests on behalf of [non-party state] fall outside the language of Rule 19(a)(2), and thus cannot be the basis for [defendant's] necessary party argument.)

Besides not having any claimed interest in the subject property, the Confederacy unequivocally states that it "is satisfied that its interest ... will be fully and adequately protected as long as the Plaintiff MOHAWK NATION COUNCIL OF CHIEFS remains a plaintiff [herein][.]" Heath Decl'n at 2, ¶ 4. Under that scenario, as Heath explains it, the Confederacy's "interests [would be] protected because the Mohawk Nation Council of Chiefs is one of the constituent Nation governments of the ... Confederacy Grand Council of Chiefs[,] and the Mohawk Nation Council of Chiefs acts under the authority of the [latter] ... Council[.]" *Id.* (citation omit-

ted). Stated differently, given that the Mohawk Council is a plaintiff herein, and because it cannot act without the Confederacy Council's authority, the Confederacy is *not* concerned that the named plaintiffs will conduct this litigation in a manner adverse to the Confederacy's interests. *Contra Oneida Tribe of Indians of Wisconsin v. AGB Properties, Inc.,* Nos. 02–CV–233LEKDRH, etc., 2002 WL 31005165, at *3 (N.D.N.Y. Sept.5, 2002) ("Despite the Tribe's protest that it can adequately represent the interests of the Absent Parties, the facts reveal an antagonistic relationship among the Tribe and the Absent Parties that precludes fair representation of the Absent Parties' interests by the Tribe.") If the Confederacy is not concerned about adequate representation under these circumstances, neither is the court.

For all of these reasons, the court grants the Tribes' motion to strike the indispensable party defense which the State and the Municipal defendants are alleging. *See* St. An. (82–CV–783) at 15, ¶ 34; St. An. (89–CV–829) at 14, ¶ 37; and Mun. Def. An. (89–CV–829) at 16, ¶ 79. Having found that the Iroquois Confederacy is not a necessary party under Rule 19(a), there is no need to consider the second prong of Rule 19's two-prong analysis. *See Oneida Reservation,* 194 F.Supp.2d at 116, n. 6.

### I. *"Defense of Setoff or Offset"*

 In one form or another, all of the defendants are seeking "set-off" or "off-

---

The Counties argued that those declarations should not be considered because they were "conclusory and not based upon personal knowledge." *Id.* Reasoning "that the party itself would be the best judge of whether it had an interest in the subject matter of the litigation and whether its interests were adequately protected in its absence[,]" Judge Hurd considered those declarations. *Id.* This court adopts Judge Hurd's sound reasoning in connection with the Heath declaration, and will consider it on this motion.

set"[29] for improvements made to the subject property. The State also couches this affirmative defense[30] in terms of "recoupment." It is the only defendant to do so. The State and the Power Authority also are seeking an offset for consideration received by the St. Regis; the Municipal defendants are not however. The State alone is seeking an offset for any amounts for which the U.S. might be found liable and, alternatively, indemnification from the U.S. The defendants have designated all of these allegations as affirmative defenses, as opposed to counterclaims.

In sharp contrast to every other aspect of this motion, the Tribes are *not* seeking to strike any of these so-called affirmative defenses. Rather, because they believe these defenses have been improperly designated, in accordance with Fed.R.Civ.P. 8(c), at this juncture the Tribes are seeking only to convert the same to counterclaims. Then, assuming conversion, dismissal of same is the subject of separate, related motions which will be discussed hereinafter.

Differentiating between what the court will loosely refer to as "setoff" defenses and counterclaims is "important," the Tribes reason, because "allowing set-off to be pleaded as a defense might otherwise result in affirmative recovery against the Plaintiffs, which would be barred by sovereign immunity if treated as a counterclaim." Tr. Memo. at 14 (citation omitted). The defendants do not respond to that argument. Instead, they retort that the challenged allegations "are proper setoff defenses[ ]" because the effect would be to "reduce the amount of damages, should the Trib[es] . . . ultimately prevail[.]" Def.

Memo. at 45 (emphasis added). Alternatively, if the court deems any of these purported defenses to be counterclaims, the State contends that "whether considered setoff or recoupment[,]" they "ha[ve] been properly raised." *Id.* at 47.

Rule 8(c) provides in relevant part that "[w]hen a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed.R.Civ.P. 8(c). In the present case, "justice . . . requires" that the defendants' "offset" defenses be converted to counterclaims. For one reason, there is authority for the proposition that "both set-offs and recoupments are to be pleaded as *counterclaims* rather than affirmative defenses." *Middletown Plaza Associates v. Dora Dale of Middletown, Inc.*, 621 F.Supp. 1163, 1165 (D.Conn.1985) (citing, *inter alia*, 3 Moore's, *Federal Practice* ¶ 13.02 at 13 n. 1 (2d ed.1985); 6 Charles A. Wright & Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure*, Civil § 1401 (1971 & Supp.1982)) (emphasis added); *accord Federal Deposit Insurance Corp. v. Modular Homes, Inc.*, 859 F.Supp. 117, 122 (D.N.J.1994) (citations omitted) ("Although set-off has occasionally been referred to as a defense, . . . , more often, New Jersey courts have treated set-off as a counterclaim, and have specifically distinguished set-off from affirmative defenses."); *but see* 5 C. Wright & A. Miller, *Federal Practice and Procedure*, Civil § 1275, at 459–60 (2d ed. 1990) ("[I]t is not clear whether set-offs and recoupments should be viewed as defenses or

---

**29.** The parties use these two terms interchangeably. For the sake of clarity, the court will refer to them both as "offset."

**30.** As noted at the outset, there is a conceptual distinction between an affirmative defense

and a defense. For the sake of brevity, however, in this section any reference to a "defense" shall be read as meaning an "affirmative defense."

counterclaims[.]"). To be sure, as defendants point out, the Second Circuit has observed that the distinction between set-off and recoupment is practically obsolete for pleading purposes. *See Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 145 n. 2 (2d Cir.2002) (internal quotation marks and citation omitted) (emphasis added) ("th[at] distinction ... retains little significance under the modern rules for asserting *counterclaims* in pleading[ ]"). The defendants in the present case are conveniently ignoring the underlying assumption in *Westinghouse Credit,* which is that whether termed offset or recoupment, a counterclaim is the proper designation.

Moreover, the defendants are also overlooking the established definition of recoupment—"a method by which a defendant may reduce the amount of damages it is liable to pay." *Oneida Reservation,* 194 F.Supp.2d at 145 (citing 20 Am.Jur.2d Counterclaim, Recoupment, and Setoff § 5 (1995)). "The focus of recoupment, therefore, is on the diminishment of a defendant's monetary liability, not on the plaintiff's recovery." *Id.* Thus, "[a] recoupment claim is designed to allow a defendant to reduce its obligation to pay on a claim[.]" *Id.* Ironically, these are the exact same reasons which the defendants offer to justify their position that the improvement and consideration "defenses" should not be converted to counterclaims.

For example, if the Tribes recover, the defendants are seeking to reduce the amount of that recovery by improvements made to the subject property, other than those which may be attributable to the Tribes. Similarly, the defendants are seeking to reduce the amount of the Tribal plaintiffs' recovery, if any, by the amount of any consideration which the Tribes may have received for the subject property. It is difficult to imagine any more apt descriptions of recoupment.

There is another compelling reason for treating as counterclaims what the defendants have designated as defenses. Doing so is consistent with the purpose of Rule 8(c), which "is to avoid unfair surprise to a litigant and to place the burden of pleading a claim or defense on the party who controls the information necessary to establish a claim or defense." *Laborde, supra,* 1999 WL 38253, at *5 (citation omitted). To illustrate, here, in all likelihood it is the defendants who have the evidence, or who are in the best position to obtain it as to the improvements each of them may have made to the subject property. In a similar vein, during Phase I of the *Cayuga* trial, the State had evidence of the amounts of consideration it paid to the Cayuga and when those payments were paid. Assuming the State made similar payments to the St. Regis, there is no reason to believe that proof of same is not in the State's hands, or certainly is more readily accessible to the State than to the Tribes. Consequently, as Rule 8(c) allows, the court hereby designates the following affirmative defenses as counterclaims: (1) the State's 7th, 29th and 30th defenses as alleged in Main Land I (82–CV–783); (2) the State's 7th, 32nd and 33rd defenses as alleged in Main Land II (89–CV–829); (3) the Municipal defendants' 12th affirmative defense as alleged in Main Land I (82–CV–783); (4) the Municipal defendants' 23rd affirmative defense as alleged in Main Land II (89–CV–829); and (5) the Power Authority's 10th affirmative defense as alleged in both the Island action (82–CV–1114) and the Main Land II action (89–CV–829). The court will address these counterclaims in the companion motions to dismiss same.

In reaching this conclusion, the court is well aware of its prior discussion in *Cayuga Indian Nation of N.Y. v. Pataki,* 1999 WL 224615, at *14—*15 (N.D.N.Y. Ar. 15, 1999); (Cayuga VIII) *see also* Def.App. I

at 14 (same), and the Second Circuit's decision in *Oneida III*, 719 F.2d at 541–42, regarding the availability of a "set-off" for improvements, and in the former case for consideration as well. Significantly, however, there was never a dispute in either of those cases as to the pleading status of "offset." In fact, it was not until the trials in those cases, or just prior thereto, that the issue of improvements and consideration, and how the same might impact damages. Consequently, because the "off-set" issue has arisen here in a completely different context than it has in prior land claim actions, the court's rulings today are not inconsistent with its prior rulings in this regard.

### J. "Defenses of Diminishment and Disestablishment"

■ The State is the sole defendant asserting affirmative defenses based upon diminishment and disestablishment, and then only in a cursory fashion. In both of the Main Land actions, the State separately alleges that "[t]he plaintiffs' claims are barred or substantially mitigated by the defense of diminishment [and/or] disestablishment." St. An. (82–CV–783) at 15, ¶¶ 32 and 33; and St. An. (89–CV–829) at 14, ¶¶ 35 and 36. It offers no details. That omission is compounded by the fact that diminishment and disestablishment are not synonymous. As this court has previously noted, *see Thompson v. County of Franklin*, 987 F.Supp. 111, 112 n. 4 (N.D.N.Y.1997), and the Eighth Circuit has explained, "[a]lthough the terms 'diminished' and 'disestablished' have at times been used interchangeably, disestablishment generally refers to the relatively rare elimination of a reservation while diminishment commonly refers to the reduction in size of a reservation." *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1017 (8th Cir.1999) (citations omitted). "A finding of diminishment generally suggests

that a discrete, easily identifiable parcel of land has been removed from reservation status." *Id.* (citation omitted).

Regardless, it should be readily apparent that without any supporting factual allegations it is impossible to say at this juncture whether the State has properly alleged disestablishment *or* diminishment. The State's diminishment and disestablishment defenses are, as the Tribes' suggest, "conclusory." *See* Tr. Memo. at 16. The State does not provide any factual context whatsoever for these claimed defenses. In contrast, as will be seen, in alleging disestablishment as a counterclaim, the Municipal defendants provide at least some factual background. The conclusory nature of the State's diminishment and disestablishment as defenses is not, however, a reason to strike the same. Instead, the court will grant the State leave to replead disestablishment and diminishment, but as counterclaims, not as affirmative defenses. *Cf. Oneida Indian Nation*, 194 F.Supp.2d at 121 (although pled as affirmative defenses, court treated disestablishment and diminishment as counterclaims).

### K. Defenses Properly Pled/Replead

Leaving no stone unturned, lastly defendants argue that their affirmative defenses are properly pled and thus should not be stricken as conclusory. Alternatively, if the court is striking any of these defenses as conclusory, defendants are seeking "leave to replead with greater particularity." Def. Memo. at 52. As should be abundantly clear by now, however, in granting the Tribes' motion to strike certain affirmative defenses, the court is *not* basing its decision on the supposed conclusory nature of those defenses. Rather, the court is striking certain defenses because they are legally insufficient under the applicable law. Consequently, there is no need for the court to consider the defen-

dants' last-ditch effort to save these stricken defenses.

## III. CONCLUSION AS TO AFFIRMATIVE DEFENSES

The court is keenly aware that the standard for granting a Rule 12(f) motion to strike is deliberately "narrow" so as "to provide a party the opportunity to *prove* [the] allegations if there is a possibility that [the] defense or defenses may succeed after a full hearing on the merits." *See Carter–Wallace, supra,* 47 F.R.D. at 368. The court is equally cognizant of the fact that it "should not tamper with the pleadings unless there is a strong reason for so doing[,]" *i.e.* 'that the defense is *totally insufficient* as a matter of law." *See Etienne v. Wal–Mart Stores, Inc.,* 197 F.R.D. 217, 220 (D.Conn.2000) (internal quotation marks and citations omitted) (emphasis added). On the other hand, "defenses which would tend to significantly complicate the litigation are particularly vulnerable to a motion to strike." *Narragansett Tribe, Etc. v. So. R.I. Land Devel.,* 418 F.Supp. 798, 801 (D.R.I.1976) (citation omitted).

In the present case, as the preceding extensive discussion reveals, there are a number of defenses which are "vulnerable" to the Tribes' motion to strike in that they are insufficient as a matter of law. Moreover, denying the Tribes' motion to strike in its entirety would result in further unnecessary delay because the parties would be forced to conduct discovery as to all of the affirmative defenses—a number of which are clearly without merit. "[T]he prejudice that would result to [the Tribes] by forcing them to respond to burdensome discovery requests on … issue[s] which [are] not legitimately in dispute" is readily apparent. *See Oneida Reservation,* 194 F.Supp.2d at 121. Litigation of these meritless defenses also would result in piece-

meal litigation. This is especially so given the defendants' insistence on discovery, which, in this court's experience in other land claim litigation is quite often conducted in stages, and sometimes requires a hearing. *See, e.g., Cayuga X, supra,* 1999 WL 509442 (hearing conducted to determine, in essence, viability of ejectment as a remedy). In fact, the defendants in the present case are strongly suggesting the need for a separate hearing regarding laches. *See, e.g.,* Def. Memo. at 15.

Finally, granting the Tribes' motion to strike the affirmative defenses which have no basis in this land claim litigation serves the "extremely valuable" purpose of "[w]eeding out legally insufficient defenses at an early stage of a complicated law suit … to avoid the needless expenditures of time and money, in litigating issues which can be foreseen to have no bearing on the outcome." *Narragansett Tribe,* 418 F.Supp. at 801 (citation omitted).

Before moving on to consider the motions to dismiss certain counterclaims, the court is compelled to make one observation. Echoing the optimism of other courts faced with these land claim lawsuits, and especially in light of recent news reports of a possible settlement, "[h]opefully, this [relatively] early resolution of defenses that 'could not possibly prevent recovery' by the plaintiff, …, will facilitate the orderly progress of this protracted litigation towards either a trial or settlement." *See Mohegan Tribe, supra,* 528 F.Supp. at 1362 (quoting *Narragansett Tribe,* 418 F.Supp. at 802)).

## IV. Counterclaims

Having resolved the Rule 12(f) motion to strike affirmative defenses, the court is not in a position to consider the motions by the Tribes and by the U.S. to dismiss the counterclaims. In comparison to the numerous affirmative defenses which the de-

fendants are asserting, their counterclaims are few.

The Municipal defendants are asserting two counterclaims against the Tribes. In the first, the Municipal defendants allege that any rights created in the Tribes' favor by the 1796 Treaty were, *inter alia,* "disestablished" by a series of subsequent treaties between the "St. Regis Indians" and the State. *See* Mun. Def. An. (82–CV–783) at 21,–22, ¶ 104; and Mun. Def. An. (89–CV–829) at 26–27, ¶ 118. In light of the foregoing, the Municipal defendants are seeking a "declaration that they are entitled to possession of and/or ownership of the parcels within" the claim area "to which [the Municipal defendants] currently claim possession or ownership." *Id.* at 22, ¶ 105; and *id.* at 27, ¶ 119. In their second counterclaim, the Municipal defendants are seeing "to recoup the value of any and all improvements made by the Municipal defendants to the land held by the[m]." *Id.* at 22, ¶ 106; and *id.* at 27, ¶ 120. This counterclaim is substantially similar to the Municipal defendants' two affirmative defenses seeking "offset" for improvements—defenses which are now being treated as counterclaims.

The State's counterclaims which are specifically designated as such are directed solely at the U.S. The State is basing these counterclaims upon its view that the U.S. "should be held ultimately responsible for all or part" of any damages awarded. Memorandum of Law in Support of the State Defendant's [sic] Opposition to the United States' Motion to Dismiss State Counterclaims ("St. Opp'n Memo.") at 3. In this regard, the State is asserting "contribution" and "recoupment" counterclaims, as well as a counterclaim based upon the "Quiet Title Act." In addition to the counterclaims which the Municipal and State defendants are asserting, as discussed earlier in subsection J, this court converted to counterclaims ten affirmative defenses sounding in recoupment.[31]

Plaintiffs' overriding position is that regardless of the nature of the counterclaim, the court lacks subject matter jurisdiction, and the defendants have failed to state a claim. Hence the court must dismiss all of these counterclaims pursuant to Fed. R.Civ.P. 12(b)(1) or Fed.R.Civ.P. 12(b)(6), or both.

### A. Legal Standards

The standards governing dismissal under Rule 12(b)(1) and 12(b)(6) are well-established and quite "generous." *See Hamilton Ch. of Alpha Delta Phi v. Hamilton College,* 128 F.3d 59, 63 (2d Cir.1997). Furthermore, " '[t]he standards for reviewing dismissal granted under [those two Rules] are identical.' " *Piorkowski v. Parziale,* No. 3:02CV00963, 2003 WL 21037353, at *2 (D.Conn. May 7, 2003) (quoting *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999)).

To reiterate, insofar as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is concerned, the same "will be denied unless 'the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such a claim is wholly insubstantial and frivolous.' " *Id.* (quoting

---

31. The Power Authority also is asserting two counterclaims against the U.S. *See* Power Authority's Answer to United States' Amended Complaint–in–Intervention at ¶¶ 33 and 34. The U.S. describes its motion as one to "[d]ismiss *[d]efendants'* [c]ounterclaims[,]" *see* U.S. Memo at title page (emphasis added), but a quick perusal of its supporting memorandum, along with the U.S.' Notice of Motion, reveals that this motion is directed *solely* to the State's counterclaims against the U.S. Obviously then, the Power Authority's counterclaims are beyond the scope of this decision.

*Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). "If the claim is neither immaterial nor insubstantial, 'we assume or find sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits.'" *Id.* (quoting *Carlson v. Principal Financial Group,* 320 F.3d 301, 307 (2d Cir.2003)).

In a similar vein, under Rule 12(b)(6), "[t]he complaint should not be dismissed unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief." *Gavlak v. Town of Somers,* 267 F.Supp.2d 214, 216–17 (D.Conn. 2003) (citing *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999)). "The issue is whether the plaintiffs, as claimants, are entitled to offer evidence to support their claim, not whether they ultimately will prevail." *Id.* "Indeed, it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* (citation omitted). The standard is the same when deciding a motion to dismiss a counterclaim. *See Raine v. Paramount Pictures Corp.,* No. 97 Civ. 3553, 1998 WL 655545, at *5 (S.D.N.Y. Sept.24, 1998) (citations omitted).

### B. Immunity

Regardless of how the counterclaims are styled, the arguments for their dismissal can be distilled into a single word—immunity. Asserting its sovereign immunity, the U.S. maintains that the State's counterclaims are "fundamental[ly] flaw[ed]" due to the State's "inability to "pierce the [U.S.'] sovereign immunity[.]" Memorandum in Support of United States' Motion to Dismiss Defendants' Counterclaims ("U.S.Memo.") at 4. Therefore, the U.S. argues that all three of the State's coun-

terclaims "must be dismissed as a matter of law[ ]" because the court lacks subject matter jurisdiction over same. *Id.* Similarly, the Tribes argue that they have tribal immunity, and hence the State's [32] and the Municipal defendants' counterclaims against them also should be dismissed. Given the substantial similarity between tribal and sovereign immunity, there is no need to distinguish between the two, at least for purposes of these motions. *See Oneida Reservation,* 194 F.Supp.2d at 135, n. 42 (citation omitted).

In *Oneida Reservation,* the court accurately set forth the general principles regarding sovereign immunity as they pertain to actions involving Indian tribes. It "is a well-accepted principle of law ... [t]hat the [U.S.] and Indian tribes possess sovereign immunity from suit[.]" *Id.* at 135 (citing *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Kiowa Tribe v. Manufacturing Tech.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998) ("As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity.")). "However, both the United States and Indian tribes may waive their immunity." *Id.* Significantly, however, "[t]here is no automatic waiver of immunity as to counterclaims when the United States or an Indian tribe brings a lawsuit, and thus no general right of defendants to bring counterclaims against the United States or an Indian tribe. *Id.* at 136 (citing *Presidential Gardens Assocs. v. U.S.,* 175 F.3d 132, 140 (2d Cir.1999); *Oklahoma Tax Comm'n*

---

**32.** The State is not asserting any separate counterclaims against the Tribes, as it is against the U.S. However, because the court deemed the State's recoupment affirmative defenses to be counterclaims, the same are being addressed in this section.

*v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)).

With these basic rules in mind, the court will consider the parties' arguments as to dismissal of the counterclaims.

### 1. "Recoupment"

■ As mentioned earlier, all of the defendants are seeking recoupment for improvements made to the subject property. The State and the Power Authority are seeking recoupment for consideration paid to the Tribes as well. Furthermore, the State's second designated counterclaim against the plaintiff-intervenor, the U.S., is one for "recoupment." New York State Defendants' Answer and Counterclaims to the United States' Amended Complaint in Intervention at 15 ("St. An. to U.S. Co.") Essentially the State is claiming that due to the "negligence of the [U.S.,] and by other tortious conduct of the [U.S.,]" the U.S. should "be ordered to pay the State as recoupment, . . ., the amount of any loss, with interest, suffered as a result of a judgment for the [U.S.]" *Id.* at 18, ¶¶ 15 and 2.

■ Arguing that they have not waived their sovereign immunity and hence this court lacks subject matter jurisdiction, plaintiffs are seeking dismissal of these recoupment counterclaims. It is "well-established that when the [U.S.] or an Indian tribe initiates a lawsuit, a defendant may assert counterclaims that sound in recoupment even absent a statutory waiver of immunity." *See Oneida Reservation,* 194 F.Supp.2d at 136 (citing, *inter alia,* U.S. v. Forma, 42 F.3d 759, 764 (2d

Cir.1994)). A court has subject matter jurisdiction over a counterclaim sounding in recoupment so long as that counterclaim "arises 'out of the transaction that grounds the main action' and must request only a set-off of damages, not affirmative recovery." *Id.* (citing *Forma,* 42 F.3d at 765). This is commonly referred to as the "same transaction" test. "Thus, as long as Defendants' counterclaim does not 'venture outside the subject of the original cause of action,' the [U.S.] and the tribal Plaintiffs can be considered to have waived their immunity to such a counterclaim." *Id.* (footnote omitted) (quoting *United States v. Tsosie,* 92 F.3d 1037, 1043 (10th Cir. 1996) (citations and internal quotations omitted)).

Here, despite plaintiffs' protestations to the contrary, none of these recoupment counterclaims "venture outside" the NIA claims which dominate this lawsuit. Indeed, as mentioned earlier in connection with "offset," through these counterclaims the defendants are seeking to reduce the amount for which they may eventually be held liable. As such, these counterclaims are "properly asserted against an opposing party that is liable to a defendant for part of the defendant's obligation." *See Oneida Reservation,* 194 F.Supp.2d at 145. Furthermore, none of the defendants are seeking independent recovery separate and apart from plaintiffs' NIA claims. Thus, as in *Oneida Reservation,* the court finds that "[d]efendants' recoupment counterclaim[s] . . . [are] *not* subject to sovereign immunity. *See id.* (emphasis added).[33] Accordingly, the court denies the plaintiffs' motion seeking to dismiss these recoup-

---

**33.** In light of the discussion above, there is no need for the court to address the U.S.' argument that the State's recoupment counterclaim is based on actions of the U.S. that are exempt from liability under the Federal Tort Claim Act ("FTCA"), 28 U.S.C. §§ 1346(b).

*See Oneida Reservation Case,* 194 F.Supp.2d at 145 (because defendant's recoupment counterclaim not subject to sovereign immunity, court did not consider argument that such claim improperly brought under FTCA).

ment counterclaims, with one exception which will be addressed below.

To the extent the State is seeking affirmative recovery arising out of its recoupment counterclaim, the court grants plaintiffs' motion to dismiss same. To illustrate, in paragraph two of its recoupment "wherefore" clause, the State is requesting that "[t]he [U.S.] be ordered to pay the State as recoupment, set off or otherwise, the amount of any loss, with interest, suffered as a result of a judgment for the ]U.S.][.]" St. An. to U.S. Co. at 18, wherefore clause, ¶ 2. That affirmative relief is barred, however, because it does not properly come within the scope of a recoupment counterclaim. *See Forma*, 42 F.3d at 765 ("[I]t has long been absolutely clear that the exception does not permit any affirmative recovery against the United States on a counterclaim that lacks an independent jurisdictional basis."). In all other respects, however, the court denies plaintiffs' motion to dismiss defendants' various recoupment counterclaims.

### 2. *Disestablishment*

▮ Only the Municipal defendants are asserting a counterclaim against the plaintiffs based, among other things, upon disestablishment. *See* Mun. Def. An. (82–CV–783) at 21–22, ¶¶ 104–05; and Mun. Def. An. (89–CV–829) at 26, ¶¶ 118–19. In particular, the Municipal defendants are alleging that any rights which the plaintiffs may have had arising out of the 1796 Treaty "were ceded, released, relinquished and/or disestablished by" subsequent treaties between the State and "the St. Regis Indians[.]" *See id.* at 21–22, ¶ 104; and *Id.* at 26–27, ¶ 118. As relief, those defendants are seeking a "declaration that they are entitled to possession of and/or ownership of the parcels within the lands claimed herein by Plaintiff[s] to which they

currently claim possession or ownership." *Id.* at 22, ¶ 105; and *id.* at 27, ¶ 119.

On nearly identical facts, the court in *Oneida Reservation* accurately stated that "[c]ounterclaims such as this one have been held to be permissible against Indian plaintiffs." *Id.* at 137 (citing, *inter alia, Rosebud Sioux Tribe v. A & P Steel, Inc.*, 874 F.2d 550, 552–53 (8th Cir.1989)). Ultimately Judge Kahn found that "Defendants' disestablishment counterclaim sounds in recoupment and ... such a claim may proceed against the ... Plaintiffs despite their claims of immunity." *Id.* To support this finding, Judge Kahn relied upon reasoning which applies with equal force here:

> This counterclaim arises out of the same transactions and seeks relief similar to that sought by plaintiffs and the United States. In addition, the relief sought by Defendants is for an amount no more than that sought by Plaintiffs and the United States. Defendants do not seek any monetary or other relief beyond a finding that the land at issue does not belong to Plaintiffs and is not under federal jurisdiction.

*Id.* Accordingly, this court too will allow the Municipal defendants' counterclaim in this regard to stand.

### 3. *"Contribution"*

▮ Contribution is another of the State's counterclaims which the U.S. seeks to dismiss. According to the State, the court has jurisdiction over this counterclaim based upon sections 1346(b) of the FTCA. *See* St. An. to U.S. Co. at 12, ¶ 2. The State asserts that the U.S., as a guardian of the plaintiff Tribes, breached its fiduciary duties to those Tribes in a number of ways. For example, the State alleges that the U.S. "had an affirmative obligation to act with care to preserve and protect the property of the [Tribes,]" as

well as "an affirmative duty to act in the best interests of the ... Tribe[s] and not in its own interest." *Id.* at 12–13, ¶ 4. Then, to the extent the various transactions at issue herein allegedly violated the NIA, supposedly the U.S. breached its fiduciary duty to the Tribes "prior to and in connection" therewith. *Id.* at 14, ¶ 10. The State also alleges that the U.S. breached its fiduciary obligations to the Tribes by not taking any action to protect them with respect to the subject land transactions, until the U.S. finally intervened in this lawsuit a few years ago.

The State's allegations do not end there. Continuing, the State alleges that those breaches were "a substantial factor and legal cause of... the ... Tribe[s'] loss of the use and occupation of their land[.]" *Id.* at 14, ¶ 12. Given these claimed breaches, the State contends that the U.S. waived its sovereign immunity under the FTCA. Therefore, if a judgment is entered in favor of the Tribes and against the State, the State maintains that it is entitled to contribution from the U.S. towards the judgment. *See id.* at 15, ¶ 1.

As with the State's other counterclaims, the primary thrust of the U.S.' dismissal argument is lack of subject matter jurisdiction because the U.S. has not waived its sovereign immunity. Of the six arguments which the U.S. is advancing, the court will first consider lack of standing because without it, the court lacks subject matter jurisdiction. *See Fair Housing, supra,* 316 F.3d at 361. The U.S. contends that the State lacks standing to assert contribution as a counterclaim because as a "third-party," the State cannot enforce the trust responsibilities which the U.S. owes to the Tribes. *See* U.S. Memo. at 17. The court in *Oneida Reservation* rejected this same argument, and there is no need to revisit it now. Suffice it to say that for the reasons set forth therein, this court finds that the

State *does* have standing under the FTCA to bring a contribution counterclaim. *See Oneida Reservation,* 194 F.Supp.2d at 142–43. That is so despite the fact that the State is alleging that the U.S. engaged in wrongdoing with respect to the Tribes, as opposed to alleging that the U.S. engaged in any wrongdoing with respect to the State itself. *See id.*

■■■ Although the State has survived the U.S.' standing challenge, nonetheless its contribution counterclaim must be dismissed. To state a claim under the FTCA, a party must satisfy six separate elements. *See Dorking Genetics v. U.S.,* 76 F.3d 1261, 1264 (2d Cir.1996). Here, the parties disagree as to whether the State can meet the FTCA's requirement that "the claim must be ... against the [U.S.;] ... under circumstances where the [U.S.], if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *See id.* (quoting *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994) (quoting in turn 28 U.S.C. § 1346(b)). "[F]or liability to arise under the FTCA, a plaintiff's cause of action must be 'comparable' to a 'cause of action against a private citizen' recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." *Id.* at 1266 (internal quotation marks and citation omitted). Thus, "[t]he FTCA's law of the place requirement is *not satisfied* by *direct violations* of the Federal Constitution *or of federal statutes* or regulations *standing alone.*" *Id.* (internal quotation marks and citation omitted) (emphasis added). "There *must, in addition,* be a *breach of duty under* the *law* of *New York.*" *Id.* (footnote omitted) (emphasis added).

In the present case, the State maintains that it can easily satisfy the law of the

place element because its counterclaim for contribution is based upon New York state law. The State is failing to take into account, however, that at this juncture the focus is on the source of the alleged breach of duty. Starting from that premise, the U.S. responds that its duty to the Tribes derives exclusively from federal law, *i.e.* the NIA, and not from state law. Indeed, according to the U.S. there is no other comparable state law cause of action, and thus the State's FTCA counterclaim must be dismissed. *See Davis v. United States,* 395 F.Supp. 793, 795 (D.Neb.1975), *aff'd,* 536 F.2d 758 (8th Cir.1976) ("Unless the [state] law ... would declare liability—including a duty—upon a private person in the same circumstances, no jurisdiction lies in this court.")

Second Circuit case law clearly supports the U.S.' position. For example, in *Dorking,* the Second Circuit rejected an FTCA claim against the U.S. finding that the government's duty derived from a federal statute, and there was no comparable state statute "recogniz[ing] a duty of private actors to prohibit export of diseased cattle." *Dorking,* 76 F.3d at 1266. Likening the present case to *Dorking,* the U.S. reasons that the State's FTCA claim here is predicated upon a specific federal statute, the NIA; and there is no similar state statute imposing a duty on private persons to protect tribal real property interests throughout the State. The court agrees.

To be sure, the Second Circuit has adopted an expansive definition of the "law of the place" for section 1346(b) purposes. *See Zimmerman v. United States,* 171 F.Supp.2d 281, 292 (S.D.N.Y.2001) (citing, *inter alia, Caban v. United States,* 728 F.2d 68, 72 (2d Cir.1984)). Under this "whole law" approach, a court must "look *to all* law, including federal law, that a state court would apply in similar circumstances involving a private defendant."

*Id.* (citation omitted) (emphasis added). Even under that broad definition, however, the State has failed to convince this court that its contribution counterclaim may be properly brought under the FTCA. Plainly there is no state analogue for the U.S.' fiduciary duties under the NIA.

The court is keenly aware that in *Oneida Reservation* Judge Kahn reached a different result. Heavily focusing on the viability of the State's contribution counterclaim, *see Oneida Reservation,* 194 F.Supp.2d at 143, he gave only cursory treatment to the source of the U.S.' duty however. Relying upon several cases, including *United States v. Oneida Nation of New York,* 201 Ct.Cl. 546, 477 F.2d 939, 942 (Ct.Cl.1973), wherein the Court recognized the existence of a fiduciary relationship between the Oneida and the U.S. based upon the NIA, Judge Kahn declared that "[t]here is ample caselaw supporting a finding that the [U.S.] owed such a duty to the Oneidas during the time period relevant to this action." *Oneida Reservation,* 194 F.Supp.2d at 143 (and cases cited therein). What Judge Kahn evidently failed to take into account, however, is that in the cases which he cited to support such a duty, the fiduciary duty arose from a federal statute, the NIA, and not from state law. Overlooking the source of the duty, particularly when there is no state counterpart, flies in the face of Second Circuit precedent, however. Furthermore, the federal government's peculiarly unique relationship with the Indians of this country, makes a finding of an analogous state law based duty even more attenuated here. Therefore, because the State's allegations fail to satisfy the law of the place element of a FTCA claim, the State has failed to allege a cognizable claim thereunder, and such counterclaim must be dismissed. *See Dorking,* 76 F.3d at 1264 (citations omitted) (emphasis added) ("Unless the claim

is saved by some other waiver of sovereign immunity, ..., a *claim* which *fails to state all six elements* of § 1346(b) ... *must be dismissed* for *lack of subject matter jurisdiction.*"

#### 4. *"Quiet Title Act"*

The State designates its third counterclaim against the U.S. as being brought pursuant to the Quiet Title Act. *See* St. An. to U.S. Co. at 19. Once again the U.S. is arguing for dismissal due to lack of subject matter jurisdiction in that the U.S. has not waived its sovereign immunity. This particular counterclaim need not detain the court for long. In *Oneida Indian Nation* Judge Kahn allowed this counterclaim to stand based in part upon the fact that "[v]arious courts have found that a defendant sued by the United States as a representative for an Indian tribe, in an action to quiet title, may bring a counterclaim to quiet title itself." 194 F.Supp.2d at 146 (and cases cited therein). As in *Oneida Indian Nation,* "[w]hile the [U.S.] has not specifically requested that the Court quiet title to the land at issue in this action, it is clear from the complaint of the [U.S.] that it questions Defendants' claims of title to the land and that the title status of the land is indeed being put at issue in this action." *Id.* at 146. Accordingly, this court reaches the same conclusion as did Judge Kahn: "Because the [U.S.] does not possess immunity as to counterclaims that arise out of the same claims raised by the [U.S.] in its complaint, the Court need not consider the [U.S.'] argument that Defendants' counterclaim is barred by the QTA." *Id.*

#### 5. *Administrative Procedure Act*

In addition to the Quiet Title Act, the State asserts that this particular counterclaim arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 703,

the Judiciary and Judicial Procedure Act, 25 U.S.C. §§ 1a and 2, and under the NIA, 25 U.S.C. § 177. In addition to challenging the State's reliance upon the Quiet Title Act, the U.S. also is challenging the State's reliance upon the APA. First of all, the U.S. disputes that the APA can serve as a waiver of the State's immunity under the Quiet Title Act. The U.S.' position is well taken: "Because the QTA is the exclusive means by which adverse claimants [may] challenge title to real property,' ... the Tribe's recitation of other statues that purport to grant jurisdiction is irrelevant." *Navajo Tribe of Indians v. State of N.M.,* 809 F.2d 1455, 1469 (10th Cir.1987). Finally, the court hereby adopts the U.S.' other arguments that the State has failed to properly plead a claim under the APA, *see* U.S. Memo. at 36–37; that the U.S.' decisions to enforce the NIA "or to opine on its applicability in a given circumstance, clearly are within the [U.S.'] discretion and not subject to APA review[;]" *id.* at 37 (citations omitted); and last but not least, "even if the State properly has plead an APA failure to act claim, it seeks the wrong remedy." *Id.* at 38. Taken together, these arguments leave little doubt that the State's reliance upon the APA as a means of waiving the U.S.' sovereign immunity is misplaced.

### E. Judiciary and Judicial Procedure Act

Because the State could not be bothered to address the potential applicability of this statute to its Quiet Title Act counterclaim, neither can the court.

### V. Rulings

It is, therefore,

ORDERED that:

1. There being no objection by defendants, the court GRANTS the plaintiff Tribes' motion to strike the affirmative

defenses of abatement, adverse possession, lost grant or grants, and lack of notice.

2. The court GRANTS plaintiff Tribes' motion to strike the defendants' affirmative defenses of laches as it pertains to liability, but DENIES the same to the extent it can be read as pertaining to remedies.

3. The court GRANTS plaintiff Tribes' motion to strike the State's Eleventh Amendment defense asserted for "preservation" purposes only.

4. The court GRANTS plaintiff Tribes' motion to strike the statute of limitations defense as alleged in paragraph 18 of the State's answers in 82–CV–783 and 89–CV–829.

5. The court DENIES the plaintiff Tribes' motion to strike defendants' statute of limitations affirmative defense insofar as it is directed at any causes of action alleged pursuant to 42 U.S.C. § 1983.

6. The court GRANTS the plaintiff Tribes' motion to strike the defendants' affirmative defense of estoppel insofar as same can be read as a defense to NIA liability, but DENIES the same to the extent it can be read as a defense to relief under the NIA. The court further PRECLUDES discovery on the issue of estoppel as it relates to liability.

7. The court GRANTS the plaintiff Tribes' motion to strike the State's mitigation defense insofar as it can be read as pertaining to liability, but DENIES the plaintiff Tribes' motion to strike that defense to the extent the defendant State and the defendant Power Authority are asserting mitigation with respect to damages.

8. The court GRANTS the plaintiff Tribes' motion to strike defendants' affirmative defenses of accord and satisfaction, unclean hands and waiver insofar as they are state law based.

9. The court DENIES the plaintiff Tribes' motion to strike the defendants' affirmative defense of estoppel by sale, without prejudice.

10. The court DENIES plaintiff Tribes' motion to strike the State's 8th affirmative defense of abandonment as alleged in 82–CV–783 and in 89–CV–829, and as alleged by the Power Authority of the State of New York in its fourth affirmative defense in 89–CV–829.

11. The court DENIES without prejudice plaintiff Tribes' motion to strike the defendants' affirmative defense of release.

12. The court GRANTS the plaintiff Tribes' motion to strike the Power Authority's 12th affirmative defense in 89–CV–829, and the Municipal defendants' affirmative defenses, also based in part on the Treaty of Buffalo Creek, as alleged in paragraphs 96–101 of 82–CV–783 and in paragraphs 110–115 of 89–CV–829, to the extent those defenses are based upon ratification. However, to the extent the aforementioned defenses are encompassed within the defendants' more generic release defense, the court DENIES this motion to strike.

13. The court GRANTS the plaintiff Tribes' motion to strike the defendants' affirmative defense of "state title."

14. The court GRANTS the plaintiff Tribes' motion to strike the defendant State's affirmative defense of exhaustion of remedies.

15. The court GRANTS the plaintiff Tribes' motion to strike the indispensable party affirmative defense as alleged by the State and Municipal defendants.

16. The court DENIES the plaintiff Tribes' motion to strike as affirmative defenses the following: (1) the State's 7th, 29th and 30th defenses as alleged in 82–CV–783; (2) the State's 7th, 32nd and 33rd

defenses as alleged in 89–CV–829; (3) the Municipal defendants' 12th affirmative defense as alleged in 82–CV–783; (4) the Municipal defendants' 23rd affirmative defense as alleged in 89–CV–829; and (5) the Power Authority's 10th affirmative defense as alleged in 82–CV–1114 and in 89–CV–829, and instead designates the foregoing as counterclaims.

17. The court DENIES the plaintiff Tribes' motion to strike the State's affirmative defenses of disestablishment and diminishment; the court GRANTS the State leave to replead those defenses as counterclaims, however.

18. The court GRANTS the plaintiffs' motion to dismiss the defendant State's recoupment counterclaims to the extent the State is seeking affirmative recovery arising out of same, but in all other respects the court DENIES the plaintiff Tribes' motion to dismiss defendants' various recoupment counterclaims.

19. The court DENIES plaintiffs' motion to dismiss the Municipal defendants' disestablishment counterclaims.

20. The court GRANTS the plaintiff-intervenor, the United States', motion to dismiss the defendant State's contribution counterclaim.

21. The court DENIES the plaintiff-intervenor, the United States', motion to dismiss the State's "Quiet Title Act" counterclaim. However, to the extent this particular counterclaim is premised on the Administrative Procedure Act, the court GRANTS the United States' motion to dismiss that aspect of this "Quiet Title Act" counterclaim.

IT IS SO ORDERED.